**EDINBURGH ASSURANCE COMPANY, New India Assurance Co., Ltd., Plaintiffs,**

v.

**R. L. BURNS CORP., and American Pacific International, Inc., Defendants.**

**No. CV 76–1737–DWW.**

United States District Court, C. D. California.

Aug. 30, 1979.

McCutchen, Black, Verleger & Shea, Roger A. Ferree, John Zebrowski, Los Angeles, Cal., for plaintiffs.

MacDonald, Halsted & Laybourne, Orville A. Armstrong, Los Angeles, Cal., Franklin T. Lloyd, San Bernardino, Cal., Dorr, Cooper & Hays, George L. Waddell, San Francisco, Cal., for defendant and counterclaimants.

Michael D. Berk, Alan Holmberg, McKenna & Fitting, Los Angles, Cal., for defendant and plaintiff American Pacific International, Inc.

Jack R. Willis, Los Angeles, Cal., for John Moran.

Brown, Sims & Ayre, Thomas A. Brown, Houston, Tex., for defendant R. L. Burns Corp.

## MEMORANDUM

DAVID W. WILLIAMS, District Judge.

American Pacific International, Inc. ("API") and R. L. Burns Corporation ("Burns") obtained insurance from certain syndicates at Lloyd's of London and certain insurance corporations, members of the Institute of London Underwriters. The insurance covered risks attendant to the proposed salvage of the off-shore mobile drilling platform [1] Gatto Selvatico ("Gatto") disabled in the Mozambique Channel off the coast of Madagascar. Admiralty and maritime jurisdiction is found under 28 U.S.C. § 1333. Plaintiff insurers brought this declaratory action seeking judgment that no insured event had occurred entitling API and Burns to recover. API and Burns seek a declaration that an insured event did occur and for an insurance recovery and compensatory damages. Since the insurance contract at issue insured the Gatto venture against "Actual Total Loss Only," the principal issues are the meaning of this contract term and whether there occurred a casualty within the meaning of the term. Subsidiary issues include determinations of agency relationships among the insured several insurance brokers, and the insurers; and choice of law determinations.

### FINDINGS OF FACT

*PERSONS AND ENTITIES INVOLVED*

American Pacific International is a Nevada corporation with its principal place of business in Los Angeles, California. API's principal business is oil and gas exploration. Gerald Raydon is, and since 1973 has been, chairman of the board and president of API. R. L. Burns Corporation is a Delaware corporation with its principal place of business in California.

Emett & Chandler is a licensed surplus line insurance broker with its principal place of business in Los Angeles. Leonard P. Lawrence is president of Emett & Chandler.

Hogg Robinson-Gardner Mountain Ltd. ("Hogg Robinson") is an insurance brokerage firm with its principal place of business in London, England. Leslie Percival, Brian Graves and Dennis Risbey were during the relevant time period employees of Hogg Robinson and residents of England.

Lloyd's of London (Lloyd's) is an association of members including underwriters who represent syndicates of underwriters. The Institute of London Underwriters ("Institute") is an association of insurance companies. Both Lloyd's and the Institute are

---

1. The terms "platform" and "rig" are used synonymously to refer to the Gatto. The court occasionally uses one or the other term to apply to a specific portion of the Gatto, rather than the entire vessel; but this difference in usage is clear from the context.

located and based in England. The parties at·risk on the insurance here in issue are the individual members of certain Lloyd's syndicates of underwriters and certain corporate members of the Institute. Several hundred individual members of the underwriting syndicates are involved on the risk, a few domiciled in California and the rest in England and numerous other places. Most of the corporate insurers are incorporated in England. All the underwriters at risk have arranged pursuant to English authority to sell insurance through the London market. P.C.W. Underwriting Agencies, Ltd. ("PCW") is an underwriter in the insurance market at Lloyd's in London. J.A. W.I. Hardman is a director of PCW and a resident of England.

## THE GATTO SELVATICO

The Gatto was designed and constructed as a self-contained three-legged, mobile and self-elevating offshore drilling platform. It was designed by R. G. LeTourneau, Inc., the predecessor of the Marathon LeTourneau Company, and was built in Italy in 1960–1961 by SAIPEM and Nuovo Pignone, subsidiaries of ENI, the Italian national petroleum industry. The metal, triangular shaped hull platform was designed to be floated to a drilling site in tow. The hull platform as built housed machinery and drilling equipment, and measured 186 feet long by 152.5 feet wide by 22 feet deep. The rig as built had a triangular-shaped lattice work leg at each of the three corners; these legs were designed to be raised and lowered through apertures in the hull termed spud holes. As built, each leg was about 218 feet long with a 32-foot high bearing tank at its foot. When raised fully, e. g., for transport, much of the leg would stand erect above the hull deck. When lowered for placement at a drilling site, most of the leg, depending upon the depth of the water, would project below the hull bottom. The rig weighed about 3,500 tons.

Once the platform was positioned by tugs at the drilling site, the hull temporarily continued to ride on the ocean surface while the legs were lowered through the spud holes. The legs would contact and anchor to the sea bottom, forming a configuration somewhat like a gigantic three-legged stool resting on the ocean floor. The mechanism which had lowered the legs would continue to crank the legs downward through the three spud holes. Since, however, the leg bottoms were already braced against the sea bottom, this cranking would have the effect of jacking the hull up along those portions of the legs still above the hull deck level, pushing the hull up and above the surface of the water.

In June, 1974, the Gatto was in the Mozambique Channel in water about 100 feet deep and 18 miles from the nearest land. It was approximately 102 miles west of the port of Majunga, Madagascar, and was beginning to drill a well for its owner SAIPEM. The Gatto at this time was insured against various risks. Some of the parties presently at risk on the insurance here in issue were also at risk on this insurance for SAIPEM. On June 15, 1974, the port and starboard legs of the Gatto "toed" inwards into a crater that had developed under the rig through the washing out of the sea bottom on which the platform stood. The port and starboard legs consequently became jammed in their guides, and the legs could not be raised or lowered. Consequently, it was impossible to keep the hull level, or to move the platform. The Gatto was abandoned by its crew. After abandonment, the rig was standing on the seabed on its three legs with a 4 degree list and a trim of 2 degrees. There was an air gap of about 2 to 3 meters between the bottom of the hull and the water surface. The Gatto sustained certain damage as a result of these events. The damage sustained was considered greater than the insured value of the Gatto at that time, and it was declared a constructive total loss. The insurers paid SAIPEM on the policy.

## API'S OBTAINING OF INSURANCE

### Circumstances

In early 1975, API became interested in purchasing the Gatto from SAIPEM and salvaging it. In anticipation, API began efforts to secure insurance regarding the risks attendant to this proposed salvage

project. API discussed the matter of insurance with a number of brokers. In the summer of 1975, Lawrence of Emett & Chandler learned that API was seeking coverage and contacted Raydon, president of API. On June 3, 1975, Lawrence and Russell Pickup of Hogg Robinson met with a representative of API in Los Angeles. It appeared likely that API could pursue the obtaining of insurance through Hogg-Robinson, using the services of Emett & Chandler. Raydon and Lawrence discussed the type of insurance API was seeking. Raydon had ascertained through other contacts in the insurance industry that a Total Loss Only coverage (TLO) might be obtainable, and that this insurance would cover the various risks API anticipated. Raydon related this to Lawrence.

API's initial hope was to obtain insurance on the value of the rig, a value that would increase as more investment were made in it. It became clear to Raydon and API that only TLO-type coverage would be obtainable. Raydon explained to Lawrence that API wanted insurance up to the amount of four and a half million dollars, which was the estimate API was using for all costs it contemplated incurring in buying, salvaging, and removing the Gatto to a port of refuge.

API gave Lawrence a copy of a Telex the company had been using previously to describe the insurance it was seeking. Lawrence used that Telex and composed one of his own, which he sent to Hogg Robinson in London. Lawrence also conferred with Hogg Robinson by telephone, and the brokers produced a set of terms with which to enter the insurance market.

Eventually, through a Telex of June 20, 1975, Percival of Hogg Robinson advised Lawrence that he thought coverage could be obtained. He indicated that the proposed cover would be against "ACTUAL TOTAL LOSS." He also noted "WILL BE NECESSARY AGREE CONSTITUTES TOTAL LOSS." Lawrence advised API through a series of telephone calls that a syndicate had been contacted at Lloyd's that appeared to be interested in providing insurance, providing API gave a firm order. API placed a firm offer through Lawrence with Hogg Robinson on June 24, 1975. Lawrence conveyed the authorization to Hogg Robinson in a Telex of June 24, 1975 that, *inter alia*, included as one provision to be obtained, that "IN EVENT OF TOTAL LOSS OF LESS THAN POLICY LIMIT, ASSURED ENTITLED TO RETURN OF EXCESS PREMIUM." On June 26, 1975, Percival sent Lawrence a Telex, which stated, *inter alia*, that Hogg Robinson had not yet begun the process of placing the insurance, although it was hopeful it would start the next day, and that the proposed conditions included "AGAINST ACTUAL TOTAL LOSS OF VESSEL ONLY." Shortly thereafter, Raydon received a call from Lawrence, who informed him that API's order had been accepted, and that API was obtaining insurance. Percival sent Emett & Chandler a Telex on June 27, 1975, which stated "WE HAVE NOW MADE START ON TERMS AS YESTERDAYS TELEX" and "FINALLY WOULD EMPHASIZE COVER IS ACTUAL TOTAL LOSS ONLY WHICH MEANS VESSEL IRRETRIEVABLY LOST." This court infers that Lawrence represented to Raydon that the order had been accepted after receipt of this Telex. On July 1, 1975, Lawrence sent a letter to Raydon, enclosing the June 27 Telex from Percival. In this letter Lawrence noted that "considerable progress has been made on the placement" and that he felt confident that the placement would be completed that week. Raydon personally knew that the insurance being obtained was for actual total loss only. During the period that the broker's slip was being circulated and underwriters were subscribing to percentages of the risk, Lawrence and Percival exchanged Telexes again. Lawrence inquired in a Telex of July 3 "WHAT COVERAGES AFFORDED . . .?" Percival replied on July 4 "WE CONFIRM THAT COVERAGE IS AGAINST ACTUAL TOTAL LOSS ONLY FOR WHOLE VENTURE UNTIL ARRIVAL REPAIR PORT." On or about July 11, Raydon received a Telex directly from Percival, which in part stated that coverage was afforded

"AGAINST ACTUAL TOTAL LOSS ONLY (WHICH MEANS IRRETRIEVABLY LOST)."

The essential negotiations for this insurance contract took place in the London insurance market, where Hogg Robinson negotiated directly with the underwriters and where the critical issues of premium rate and scope of coverage were agreed on. Contacts between Hogg Robinson in London and Emett & Chandler and API in Los Angeles did not have the quality of negotiations. Their communications were within the scope of an agency relationship between API and the brokers, and included API's general delegation to the brokers to contract for insurance, information flow both ways, and certain details of instruction. London was the place of contracting. Hogg Robinson had the authority to contract for the insurance at issue on behalf of the assured, and did so.

On or about July 8, 1975, Hogg Robinson sent to Lawrence "cover notes", indicating that it had placed insurance for API "Against Actual Total Loss of vessel only." On or about July 18, 1975, Emett & Chandler completed and mailed to API a document denominated an insurance binder, which indicated that coverage was for "TOTAL LOSS ONLY." Raydon understood the binder as setting forth the terms of the insurance that he had placed.

Toward the end of September, API consummated its purchase of the Gatto from SAIPEM. Lawrence transmitted to Raydon two documents denominated as Certificates of Insurance on October 29, 1975. In them, Emett & Chandler certified that they had obtained insurance for API on the Gatto from Lloyd's and other insurance companies, through London brokers. These certificates contained a United States service of suit clause, which read:

"SERVICE OF SUIT CLAUSE: It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the insured (or reinsured) will submit to the jurisdiction of any Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court."

Immediately after API consummated its purchase of the Gatto, API undertook an inspection, inventory and survey of the rig, utilizing both its own personnel and the services of Captain Kingsley's salvage firm, W. K. Webster & Co., with whom it had contracted to undertake the salvage. Captain Kingsley made an on site inspection of the rig. API also began lining up equipment, supplies and personnel for the proposed salvage. Sums were expended. In the latter part of November 1975 API began discussions with Burns for its participation in the Gatto salvage project. These discussions led to the consummation of a joint venture agreement involving the Gatto, and on January 14, 1976, Burns became an additional insured in the policy.

### The Casualty

On January 14, 1976, the Gatto stood where it had been since the time of the initial casualty in June 1974. The platform was generally erect although tilted. The hull, although tilted, remained completely above the surface of the water. On that date, a brewing storm became more violent and developed into a typhoon. Because of the damaged condition of the platform, the hull could not be raised above wave height. The physical impact of the wave fronts moving through the platform area started to rock the hull back and forth in position, aggravating the severe crack damage around the port leg well area which had been sustained in the initial 1974 casualty. On January 24, 1976, the hull still stood out of the water, although one leg was sinking. The crack damage was propagated by the hull movement, so that eventually the cracks had extended to such a degree that the structure could no longer hold the leaning weight of the port leg against the hull. The leg broke away and fell onto the sea bed, while the buoyant hull, still attached to

two legs, sank more slowly in the sea, falling on top of the torn-off port leg. The rig had toppled over by January 30, 1976, so that the hull was submerged, and essentially all that remained above the water were the top parts of two legs and the helicopter pad. Based upon the Gatto's collapse in the storm and the damage to the platform, its owners filed claims on the insurance policy.

### The London Insurance Market

The parties have contested whether Emett & Chandler in Los Angeles and Hogg Robinson in London were agents of the insurers or the insured for various purposes, viz., issuance and delivery of the policies, and the inclusion of a service of suit clause. This court must also examine the contract formation process to ascertain the intent of the parties as to the scope of coverage. These questions require examination of the custom and practice of the unique insurance market at Lloyd's of London and the London insurance market generally.

Lloyd's was originally an association of underwriters in London with a management committee. It was incorporated in 1871 by an Act of Parliament. The Corporation of Lloyd's provides a physical site for the sale of insurance by underwriters that are members of the Corporation, together with support and incidental services to member underwriters. Lloyd's corporate committee, elected by members from among their number, administers matters of common interest to members. For example, the committee manages the affairs of the corporation, maintains the premises where insurance is sold and the facilities there. It directs accountancy, intelligence and newspaper services. An office under its direction prepares individual insurance policies based upon the terms upon which insurers and insured contract. Another office handles policy claims evaluations referred to it. Yet another office examines the credentials of insurance brokers who seek the right to place insurance at Lloyd's.

The Corporation of Lloyd's never sells insurance itself and is not at risk on the insurance sold on the floor at Lloyd's.

Rather, the underwriter members subscribe to cover all or part of a proposed placement of insurance, at their own election. Numbers of individual underwriters, many in England but others scattered throughout the world, have joined together to form syndicates. Syndicates may have anywhere from two or three to hundreds of members. The individual members are known as the "names" on that syndicate. These syndicates are the entities which subscribe on behalf of their members to cover risks and percentage parts of risks. The actual potential liability of a given name depends upon his percentage share of the syndicate of which he is a member, as well as the percentage of the risk to which his syndicate has subscribed.

Purchase and sale of insurance takes place on the floor of the underwriting room at Lloyd's and also in the offices of individual insurance companies in London. The underwriting market at Lloyd's consists of the syndicates; a syndicate or group of syndicates is in turn managed by an underwriting agency. An underwriting agency employs a management staff, and maintains a box on the floor at Lloyd's with a representative. This representative is an underwriter, who evaluates, negotiates, and decides on proposed placements of insurance brought by brokers for the consideration of the syndicate or syndicates he represents. The underwriting agent contracts for the liability of his syndicate or syndicates, and assumes no risk himself except insofar as he is a name himself on the syndicate.

The recognized custom and usage of the London insurance market is that the broker is the agent of the potential assured for most purposes, including the placement of insurance. The potential assured is recognized as the broker's client. The recognized role of the broker is to obtain the best possible terms and quotation he can from the market for his client. In addition, the brokers in the London insurance market generally serve as coordinators of all parts of the insurance, negotiation, placement, claims presentation, and sometimes pay-

ment. Only brokers who have been approved by the Committee of Lloyd's are permitted to place risks with Lloyd's underwriters. Such brokers are known as "Lloyd's brokers." Because an applicant for insurance from Lloyd's must act through a Lloyd's broker, there will often be at least one other broker in the picture. An applicant for insurance may deal with an outside broker not a Lloyd's broker, who then must contact a Lloyd's broker. In the instant case, the applicant API used the services of Emett & Chandler in Los Angeles to arrange the insurance transaction through Hogg Robinson, a Lloyd's broker in London.

The underwriter agent, or underwriter, sits at his box on the floor waiting for brokers to approach him with possible insurance risks. The broker provides for the underwriter's consideration a document known as a broker's slip, which contains the details of the risk which the broker is trying to insure. The broker negotiates with the underwriter to obtain the latter's agreement to both the insurance terms and the rate of premium. The underwriter who structures the transaction with the broker and settles on terms becomes known as the lead underwriter. The lead underwriter's syndicate is called the market lead or leader of the market for that particular risk. The lead underwriter then subscribes his syndicate to a particular percentage of the risk, for example, five percent. The underwriter places his initials on the broker's slip together with the particular percentage to which he is subscribing. By placing his initials on the slip, the underwriter considers that he has created an insurance contract between the individual members of the syndicate and the insured.[2]

The broker, having obtained the agreement of one underwriter to terms and premium, as well as a subscription to a percentage of the risk, retains the slip and approaches other syndicates or insurance companies both on the floor at Lloyd's and in the outside offices of insurance companies. The broker presents the slip to them for them to consider whether they desire to subscribe to the agreement as constituted between the broker and the lead underwriter. Each subsequent underwriter may express no interest, may agree to the terms on the same premium rate, require a higher premium rate, or require different terms. In the last two cases, underwriters who had already subscribed would be informed of new terms and their obligations normally amended to conform. In any event, the underwriter who agrees to subscribe his syndicate places his syndicate initials and the percentage of risk he desires to cover on the slip, and the broker moves on to other underwriters. In this manner the broker moves around the insurance market, both at Lloyd's and among the insurance companies, until he has obtained underwriters' commitments subscribing to one hundred percent of the risk on the slip. At that stage, the broker can confirm to the applicant for insurance or his contact with the applicant that the risk is fully subscribed, or "completed."

Once the broker has succeeded in completing the slip, that is, has obtained one hundred percent coverage, he retains the slip and returns it to his office. Participating underwriters on the risk receive a copy of that part of the slip containing terms and conditions for their files. From the information on the slip, the broker's policy department prepares the policy, using the appropriate printed forms and completing them with the appropriate terms and conditions from the slip. The completed policy and slip are then forwarded to the Lloyd's Policy Signing Office, and if companies' members of the Institute of London Underwriters are involved, to the Institute's Policy Department. Both the Lloyd's office and the Policy Department check the policy

---

2. A broker may negotiate the terms and premium with a company underwriter initially, and in such an event an insurance company is the market lead. The market sometimes recognizes both a lead underwriter at Lloyd's and a lead company underwriter. The broker, in any event, may circulate the slip among both Lloyd's syndicates and insurance companies until the risk is fully subscribed.

against the information on the slip to ensure that the policy reflects the terms and conditions on the slip. At these offices as well a list of the syndicates or companies at risk, compiled pursuant to the slip, is appended. Marine insurance policies are generally issued with a significant time lag after the signing of the slip. In order for an insured to have some evidence of the insurance placed during the period after the slip is completed but before the policy is issued, brokers may furnish the insured with a cover note memorializing the fact of insurance. Brokers consider the cover note a contract between them and the insured indicating that they have placed the insurance.

The broker also has responsibilities in the event that the insured makes a claim. His role is to present his client's claim, and present it in the best way possible, to the underwriters. If the insured makes a claim, the broker endorses the policy with details of the claim and submits it to the underwriters for their consideration. Often the market lead among the underwriters handles the claim, and other insurers follow the lead unless they have a major disagreement. Alternatively, the claim may be handled by the Lloyd's Underwriters' claims office, a central facility maintained by Lloyd's as a service to members. The broker presents the claim to an underwriter or to the claims office, depending upon instructions from the insured. If the underwriter or claims office does not agree to pay the claim, it may state its objections or raise questions, and the broker transmits the questions to the insured. In the event that the claim is accepted, the claim may be processed through accounting arrangements that exist between underwriters and brokers in the London market, and in such a case the broker transmits a check in the agreed amount to the insured. Alternatively, Lloyd's may transmit funds directly to the insureds. For example, insureds in the United States may be paid through a financial arrangement centered in New York.

### PLACEMENT OF THE INSURANCE AT ISSUE

The facts of API's placement of insurance in the London market followed the customary pattern of such transactions. The role of Emett & Chandler was that of the "producing brokers." They obtained the inquiry from API, and passed it along to Hogg Robinson with as much information as they had available. Hogg Robinson, a "Lloyd's broker", could purchase insurance in the Lloyd's market, and its role was to attempt to place the risk, getting the best terms possible for API. Hogg Robinson consulted with Emett & Chandler. L. Percival, a manager of Hogg Robinson's Marine Hull Department, formulated a slip to meet the needs of API, and another Hogg Robinson employee, Brian Edward Graves, entered the Lloyd's market to attempt to place the contract.

The broker sought the widest possible coverage in a market that already knew the Gatto to have earlier been settled as a constructive total loss in the hands of its prior owner. Graves discovered that Hardman would consider subscribing to the risk, but on strict terms. A focus of negotiations was the scope of coverage. Hardman told Graves that he would extend coverage to the value of API's investment in the salvage project to a port of refuge and that the insurance would be against actual total loss only. No defined discussion took place between the two representatives as to the exact meaning of this term, but both agreed it was an extremely narrow form of coverage. The outside monetary limit on coverage was placed at $4,500,000. It was understood that possible salvage and towage would be taking place in various territorial waters and the high seas, as well as in port. Hardman and Graves agreed on the terms, and Hardman subscribed, becoming the lead underwriter on the risk.

Graves and other Hogg Robinson brokers circulated the slip to other underwriters and obtained their signatures. All agreed that actual total loss was a very narrow form of coverage. The scope of insurance was extended to cover the period of towage of the platform from the port of refuge to the port of repair. After the insurance was

fully subscribed, Hogg Robinson retained the broker's slip, pursuant to customary practice. Also pursuant to practice, Hogg Robinson prepared a cover note from the slip, prepared a policy from the slip, and forwarded the policy to the Lloyd's signing office, and also to the policy department for the Institute of London Underwriters, for review. The assured paid premiums pursuant to the usual pattern in the London market, sending checks to their broker Emett & Chandler, which forwarded payment to Hogg Robinson, which in turn forwarded it to the London Underwriters.[3]

Based upon the above facts, this court finds that Emett & Chandler and its officers, agents, servants, and employees, and Hogg Robinson and its officers, agents, servants, and employees were agents of API in the placement of the insurance here in issue. In particular, they were agents of API and Burns in the obtaining of coverage for actual total loss only. Hogg Robinson had actual or express authority to place with the underwriters the insurance at issue, and Emett & Chandler had the actual or express authority to assist in this placement and facilitate it. From the evidence before this court, it appears that Hogg Robinson was given actual or express authority by API through its agent Emett & Chandler to obtain the greatest amount of coverage possible for the Gatto project, and the best deal possible. Hogg Robinson proceeded to obtain insurance pursuant to this commission. Emett & Chandler proceeded to facilitate this process, acting as the general intermediary between Hogg Robinson and API. Both Hogg Robinson and Emett & Chandler reasonably believed that they had the authority to obtain for the assured the insurance at issue. Hogg Robinson and its officers, agents, servants, and employees were agents of API and Burns in the preparation of the broker's slip on which was based the policies ultimately issued.

This court considers the intent of the parties relevant to the meaning of the term actual total loss in the insurance at issue. Hardman was the lead underwriter on the insurance, and was the individual who introduced the term into the negotiations. His intention was that the term as used in the policy was to be determined by the definition of that term in the British Marine Insurance Act. The underwriters who dealt with marine claims director Risbey of Hogg Robinson in the weeks after the January 1976 casualty made it clear that they were using the term as defined in the British Marine Insurance Act. David Jones, Richard Rutherford, and James Watson, underwriters' adjusters handling the claim made by API, also were considering the term as defined in the British Marine Insurance Act.

Graves considered "actual total loss" a technical term of art used in the insurance business. No direct evidence is presented on precisely which law's definition Graves considered controlling. Percival considered the term "actual total loss" to have the same meaning as the term in the British Marine Act, and he so used the term in his communications with Emett & Chandler and API. After the January 1976 casualty, Hogg Robinson marine claims adjuster Risbey also proceeded on the assumption that the British Marine Insurance Act applied. No direct evidence is presented on the intent of Lawrence as to the meaning of the term. What evidence there is suggests he may have been confused as to the meaning of the term. API's president Raydon knew that the term had a technical standard meaning in the insurance industry. He also accepted insurance with a narrow coverage because he felt that was all he could get by way of coverage. Since Raydon was and is an attorney, this court infers that he was aware of the fact that there was a question as to the choice of law to define the term, and was aware that one of the implications of contracting for insurance in the London market was that English law might apply.

---

**3.** Since Lloyd's transacts business in United States dollars, any accounting credit resulting from this process would be credited to Lloyd's dollar account held at the London branch of First National City Bank. In the event of payment a claim would issue from a Lloyd's dollar account.

It appears that Raydon may have thought that his company had obtained coverage on a broader number of risks than is legally encompassed in the definition of actual total loss.

Considering the agency relationships in fact and the circumstances of the insurance placement in issue; and reviewing and weighing all the evidence of the parties' intent, based upon contemporaneous understandings and nearly contemporaneous expressions, which are suggestive, together with the drawing of reasonable inferences, this court finds that the intent of the parties was that the English law definition of actual total loss apply to the policy term. API and Burns have failed to establish that any individualized meaning for this term was intended other than the technical legal one. Percival of Hogg Robinson foresaw that there might be some dispute as to the extent of coverage under the term, and initially thought it proper to obtain clarification of the type of casualties that might be covered. He conveyed that thought to Lawrence in his Telex of June 20, 1975. Percival testified that he thought clarification was necessary because he wanted to avoid getting into an area "where we did not know whether an actual total loss had occurred or not." He stated that this clarification "obviously was forgotten in the turmoil which followed." There is no evidence that Percival's thought that clarification was necessary was communicated to the underwriters.

API and Burns make the argument that the parties intended to contract for United States law, specifically California law, to apply to disputes arising under the insurance. The insured argue that the parties so contracted based upon the presence of the "U. S. Service of Suit Clause" in the insurance binder prepared and delivered by Emett & Chandler to API, and based upon the customary inclusion of such clauses in Lloyd's broker's slips for insureds in the United States. API and Burns further argue that such clauses are a contractual choice of law provision. This court has reviewed the evidence, and finds that the parties did not contract explicitly or implicitly for the application of United States law by means of a service of suit clause. First, it has not been demonstrated that as a factual matter the parties intended to include a U. S. service of suit clause in their contract; and second, it has not been demonstrated that parties engaged in the London insurance market consider a U. S. service of suit clause a contractual agreement for choice of United States law, as opposed merely to a provision by which the underwriters would agree to accept the jurisdiction of courts in the United States in the event of disputes. For a U. S. service of suit clause to appear in the final policy as prepared by the broker and as signed by the Lloyd's policy signing office and the policy department of the Institute, a U. S. service of suit clause term must appear on the broker's slip. Such a clause was omitted from the Hogg Robinson slip circulated among the underwriters, apparently by inadvertence. This court infers and finds that the inadvertence was on Hogg Robinson's part. Although such clauses are customarily included in Lloyd's policies to United States policy holders, no custom and usage of the London insurance market is demonstrated to show in the event that the clause is omitted that a clause is read into the contract as a binding term. Moreover, API and Burns have not shown by a preponderance of the evidence either that there was a contract for United States law to apply via a U. S. service of suit clause, or that such clauses are considered in the market as a provision for choice of United States law to govern disputes.

## CONDITION OF THE GATTO AFTER THE CASUALTY

The court considered extensive evidence on the condition of the Gatto immediately following the January 1976 casualty and shortly thereafter, including an underwater video tape survey of the platform. The physical condition of the rig did not change during the period mid-March to December 1976, at which time the underwater video tape survey was conducted, except for marine growth and further deterioration caused by the impact of the elements.

Based upon the evidence, this court finds that there was no significant difference with reference to the question of actual total loss between the Gatto's condition in mid-March 1976 and December 1976.

As a result of the January 1976 casualty, the plight of the Gatto was severe. The only part protruding above the water's surface was the top of the bow leg with the helicopter pad, the top of the starboard leg, and a part of one crane. The hull lay at an angle of about 45° to 55° to the seabed on top of the port leg. When it fell, coming to rest on top of the port leg, the leg rack punctured and penetrated the hull deeply, ripping an aperture at least 25 feet long and 24 feet wide at its widest point, and penetrating close to the center line. Watertight integrity was lost completely. The hull suffered major structural damage, and was deformed and fractured, as evidenced by cracks, buckles, stress wrinkles, and misalignment of hatch covers. The port leg yoke and preload tank were torn away. The derrick and substructure collapsed. The draw works fell into a tangled heap. The crews' quarters largely disappeared. Based upon all the evidence, this court infers that there was massive damage to equipment within the hull, as well as damage to the structure of the Gatto itself.

The numerous items of equipment on deck slid off into the sea or accumulated in a jumbled mass on the downward end of hull. Very few items remained of any use short of complete rebuilding. The main deck was cleared both of structures and equipment.

The port leg resting on the ocean bottom was severely deformed and crushed. The bow and starboard legs suffered deformation and cracking and were displaced in their gear trains. A major portion of the three legs was rendered unfit for use in repair or reconstruction, based on the stress they had suffered and resulting distortion. Gear train motors were rendered unusable and the gear trains themselves rendered almost completely useless.

Based upon the extreme state of damage suffered by the Gatto, experts concluded it was extremely unlikely that more than a few component parts of the original unit could be used in any rebuilding of the platform. All experts agreed that the Gatto was a wreck. Experts concluded that the Gatto had to be considered as wreckage or as a dispersed wreck with little value other than as scrap metal, that the Gatto, or rather, what was left of it, was of no significant value to anyone. Edgar C. Loflin, Jr., expert on drilling platforms of the Gatto type, characterized the overall picture of damage and distortion as being so great that the platform as originally constituted was essentially destroyed, and that the Gatto after the January 1976 casualty could no longer be considered a mobile drilling platform. One knowledgeable characterization of the Gatto was that it had "broken up," that is, had suffered from severe loss of structural strength from distortion, deformation, cracking, and gross discontinuity.

It is possible under the modern state of technology that the Gatto could be salvaged, in the sense that constituent pieces of the platform could be recovered from their dispersed positions on the ocean bottom and taken to shore, although at an extremely high cost.[4] Once the pieces were collected, however, no reasonable engineer would undertake the task of reconstituting an off-shore drilling platform from those parts. The effort required to reconstruct the Gatto would be too disproportionate for the resulting operational platform. No reasonable person would characterize the work needed to refurbish the Gatto as a "repair." The reasonable engineer certainly would not. The work needed to make the Gatto operational after the casualty must reasonably be considered a reconstruction or rebuilding. After the Gatto suffered the January 1976 casualty, it was without significant value. It was no longer an off-shore drilling platform. It was a dispersed mass of scrap, a wreck. The Gatto had broken up. The Gatto as such was destroyed. It was an actual total loss.

4. One salvage plan considered feasible that contemplated recovery of the major structural pieces of the Gatto estimated the cost for this alone as $6.9 million.

Any conclusion of law deemed a finding of fact is hereby incorporated by reference.

## CONCLUSIONS OF LAW

### CHOICE OF LAW

This court must apply the federal admiralty rules on choice of law. The leading cases are *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). *Lauritzen* stated as a principle governing choice of law that the court should determine and weigh the points of contact between the transaction and the states or governments whose laws are involved. The *Lauritzen* court declines to apply the Jones Act to the maritime tort at issue, determining rather that Danish law should apply to the injury to a Danish seaman, on board a Danish vessel temporarily in a Cuban port, who had fortuitously contracted for employment in New York. Further, *Lauritzen* recognized that in cases where contract law had to be considered, the choice of law should be strongly influenced by the law which the parties intended to apply. 345 U.S. at 588–589, 73 S.Ct. at 931, 97 L.Ed. at 1271. In *Romero*, the court made clear that the flexible "points of contact" analysis of *Lauritzen* was intended to provide general criteria for admiralty courts, 358 U.S. at 382, 79 S.Ct. at 485, 3 L.Ed.2d at 388. The court explained also that proper regard had to be given for the different interests applicable to different phases of maritime law. The court went on to state that choice of law principles had to take into account the relevant interests of other nations as part of the legitimate concerns of international society. *Romero* rejected application of mechanical doctrines to resolve choice of law problems, such as *lex loci delicti commissi*, 358 U.S. at 382–383, 79 S.Ct. at 485, 3 L.Ed.2d at 388. Subsequently the Supreme Court has made clear that courts should give effect to the intent of parties to freely negotiated international commercial agreements as to what law should apply, absent strong public policy factors. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 at 17, 92 S.Ct. 1907 at 916–917, 32 L.Ed.2d 513 at 524–525 (1972).

*Lauritzen* and *Romero* provide authority for this court to determine what law governs through a flexible analysis of the interests of the several states or nations whose law may be argued to apply. *Lauritzen* and *M/S Bremen* provide authority for this court to weigh heavily the intent of the parties in the choice of law determination. *Lauritzen* and *Romero* do not clearly state whether a court should apply points of contact analysis to come to a single choice of substantive law to govern all issues, or whether instead the analysis should be applied on an issue-by-issue basis, as suggested by Restatement (Second) of Conflict of Laws § 188 (1971). The better rule is to apply a points of contact analysis to each issue or set of related issues, so as to allow flexibility in choice of law. *See Samad v. The Etivebank*, 134 F.Supp. 530 at 535–537 (E.D.Va.1955). *See also Navegacion Goya, S. A. v. Mutual Boiler & Machinery Insurance Co.*, 1972 A.M.C. 650 at 654–655 (S.D. N.Y.1972). Such an approach keeps admiralty choice of law rules in step with developments in the rapidly changing area of choice of law. This court uses Restatement (Second) to illuminate the approach required by *Lauritzen* and *Romero*. It has been held in this circuit that the approach taken by Restatement (Second) is the federal admiralty choice of law rule. *Ahmed v. American S. S. Owners Mutual Protection and Indemnity Association*, 444 F.Supp. 569 at 571–572 (N.D.Cal.1978).

### Agency

■ I conclude that English law applies on the question of any agency relationship between API and Hogg Robinson, on the one hand, and Hogg Robison and the underwriters, on the other. Hogg Robinson carried out in England virtually all its brokerage activities to place API's insurance, and the contact between the brokerage contract and England is overwhelming. The international Telexes and telephone calls with Emett & Chandler and API in Los Angeles together with the short discussion

in Los Angeles in which a Hogg Robinson representative took part are quite insubstantial in comparison. England's interest in the brokerage relationship is likewise overwhelmingly stronger than any other state or nation's interest. The London insurance market is a major center of international business, and the settled expectations of actors in this market are very important and should be protected. *Cf. M/S Bremen*, 407 U.S. at 17, 92 S.Ct. at 916–917, 32 L.Ed.2d at 524–525; *Lauritzen*, 345 U.S. at 588–589, 73 S.Ct. at 931, 97 L.Ed. at 1271. *See also* Restatement (Second) of Conflict of Laws § 196 (1971). The English law is long settled that insurance brokers are agents of the assured for purposes of negotiation and placement of the insurance, including preparation of the broker's slip, and the broker is the agent only of the assured for these purposes. *Anglo-African Merchants, Ltd. v. Bayley*, (1970) 1 Q.B. 311, 322; *See also Rozanes v. Bowen*, 32 Lloyd's List L.R. (C.A.1928); E. Ivamy, General Principles of Insurance Law 531 (3rd ed. 1975).

■ In contrast I conclude that the law of California applies to the relationship between the insured and Emett & Chandler and between Emett & Chandler and the underwriters. It is not argued that there is a settled federal admiralty rule of law governing the agency relationship, and this court sees no reason to adopt one on the point. Therefore, under *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955), this court applies the California law of agency. California is the state with the greatest contact with the brokerage activities of Emett & Chandler and is also the state with the greatest interest in regulating the activities of the licensed surplus line insurance broker Emett & Chandler. *See* Restatement (Second) of Conflict of Laws § 196 (1971). Under California law, it is settled that an insurance broker is the agent for the assured in the negotiation and placement of insurance. Cal.Insurance Code § 33 (West). *Maloney v. Rhode Island Ins. Co.*, 115 Cal. App.2d 238 at 244, 251 P.2d 1027 (1953) (interpreting Cal.Insurance Code § 33).

The retention of a commission on a policy by an independent insurance broker does not constitute him the agent of the insurer. *Solomon v. Federal Ins. Co.*, 176 Cal. 133 at 139, 167 P. 859 (1917). Nothing in the factual pattern concerning negotiation and placement of the insurance provides a basis for upsetting the general rule that insurance brokers are agents of the assured, *Strangio v. Consolidated Indemnity & Ins. Co.*, 66 F.2d 330, 335 (9th Cir. 1933).

■ I, therefore, conclude that Hogg Roginson was the insureds' agent in the negotiation and placement of the insurance at issue, including preparation of the broker's slip. I conclude Emett & Chandler was the insureds' agent in the placement of the insurance at issue. I conclude further that neither broker was the underwriters' agent in the negotiation and placement of the insurance at issue.

■ With regard to the scope of the agency relationship between the insured and Emett & Chandler and the insured and Hogg Robinson, this court was presented with no live testimony from any insurance broker with a part in this transaction, nor deposition testimony from any officer or employee of Emett & Chandler. Although this court is not in a position to conclude the precise scope of the authority given by API to Emett & Chandler and to Hogg Robinson, it has before it the evidence to conclude that Hogg Robinson did have actual or express authority to place with the underwriters the insurance at issue, and that Emett & Chandler had the actual or express authority to assist in this placement and facilitate it. From the evidence before me, it appears that Hogg Robinson was given actual or express authority by API through its agent Emett & Chandler to obtain the greatest amount of coverage possible for the Gatto project, and the best deal possible. Hogg Robinson proceeded to obtain insurance pursuant to this commission. Emett & Chandler proceeded to facilitate this process acting as the general intermediary between Hogg Robinson and API. Both Hobb Robinson and Emett & Chandler

reasonably believed that they had the authority to obtain for the assured the insurance at issue.

Under English and California law, the insured are bound by the acts of their agents Hogg Robinson and Emett & Chandler taken within the scope of their actual authority as against the underwriters, third parties to the relationship of principal and agent between the insured and Hogg Robinson and between the insured and Emett & Chandler. This includes the negotiation and placement of the insurance at issue, including preparation of the broker's slip by Hogg Robinson. *See e. g. Zurich General Accident & Liability Insurance Co., Ltd. v. Rowberry*, (1954) 2 Lloyd's List L. R., 55, 57 (C.A.); Cal.Civ.Code § 2316 (West); *Mannion v. Campbell Soup Co.*, 243 Cal.App.2d 317 at 320, 52 Cal.Rptr. 246 (1966). *County, etc., Bank v. Coast Dairies etc. Co.*, 46 Cal. App.2d 355, 115 P.2d 988 (1941). Since the slip excluded a United States service of suit clause and pursuant to the slip the policies were prepared without a service of suit clause, the absence of the clause was again within Hogg Robinson's actual or express authority.

■ This court did not find that the actual or express authority initially given to Emett & Chandler and Hogg Robinson did not include authority to place insurance covering only actual total loss. Even if the insurance brokers had exceeded the actual or express authority initially given them, the contractual coverage expressed in the policies would be binding on the insured as against third party underwriters, under the principle of ratification. Cal.Civ.Code § 2307 (West); *Rakestraw v. Rodrigues*, 8 Cal.3d 67, 104 Cal.Rptr. 57, 500 P.2d 1401 (1972), *Hunter v. Parker*, 151 Eng.Rep. 789 at 797 (Exch. of Pleas 1840); *Wolff v. Horncastle*, 126 Eng.Rep. 924 at 928–929 (Common Pleas 1798); *see generally* Ivamy, Insurance at 506–513 and citations therein. By July 1975 at the latest API, through its president Raydon, knew it had obtained coverage for a narrow set of risks under a standard technical definition. API with actual knowledge unequivocally acted in ratification by remitting the initial premium payment. Furthermore, English law recognizes the doctrine that ratification of the insurance placement may be inferred by silence. 1 J. Arnould, The Law of Marine Insurance and Average 174–175 (15th ed. 1961) (published as 9 British Shipping Laws).

## ACTUAL TOTAL LOSS

### Choice of Law

■ Because the parties contracted for actual total loss coverage under the standard technical meaning of the term, the meaning of actual total loss is the dispositive legal issue of the instant case. Under the points of contact analysis of *Lauritzen* and *Romero* and the deference to the intent and expectations of the parties required by *Lauritzen* and *M/S Bremen*, this court concludes that English law applies to the definition of actual total loss.

*Romero* makes clear that points of contact must be evaluated with regard to the needs of a general federal maritime law and respect for relevant interests of foreign nations, with the controlling considerations the interacting interests of the United States and foreign countries. The essential negotiations for this insurance contract took place in the London insurance market, where Hogg Robinson negotiated directly with the underwriters and where the critical issues of premium rate and scope of coverage were agreed on. The communications between Hogg Robinson in London and Emett & Chandler and API in Los Angeles did not have the quality of negotiations between underwriter and assured, but rather were within the scope of the agency relationship between API and the brokers. The place of contracting was also London. Hogg Robinson had the authority to contract for the insurance at issue on behalf of its principal, and did so. API became bound by the insurance contract when the slip had been fully subscribed up to one hundred percent of the risk. *Thompson v. Adams*, 23 Q.B.D. 361 (1889); *see Eagle Star Insurance Co. v. Spratt*, (1971) 2 Lloyd's L.R. 116 at 124, 125, 127. This

result is the established understanding of the London insurance market. *Id.*

The London insurance market facilitates international commercial activities. Great Britain's interest in governing the transactions in that market, including the one at issue, is very great. Because of its contacts with the negotiation and contracting processes, the United Kingdom's interest should be given great weight in the choice of law, under *Lauritzen* and *Romero*. The United Kingdom, and England, is certainly the nation with the most significant relationship to the transaction, *see* Restatement (Second) of Conflict of Laws §§ 188, 193 (1971). By contrast neither the United States nor any particular state therein has a strong interest in the transaction as such.

For cases concluding that the law of the place of negotiation and contracting controls questions of insurance contract interpretation, *see Ahmed v. American Steamship Owners Mutual Protection and Indemnification Association, Inc.,* 444 F.Supp. 509 (N.D.Cal.1978); *Navegacion Goya, S. A. v. Mutual Boiler & Machinery Insurance Co.,* 1972 A.M.C. 650 at 654–655 (S.D.N.Y.1972); *Landry v. Steamship Mutual Underwriting Association,* 177 F.Supp. 142 at 146 (D.Mass. 1959), *aff'd sub nom. Steamship Mutual Underwriting Association Limited v. Landry,* 281 F.2d 482 (1st Cir. 1960).

On the question of which state or nation has a greater interest with regard to the parties, the interests are about equally balanced between the United Kingdom and England, on the one hand, and the United States and California, on the other. A great many, but not all, of the underwriters at risk reside or have their place of business in the United Kingdom and in England. All the underwriters have arranged pursuant to English authority to sell insurance through the London market. A number of underwriters live or are incorporated in the United States and places other than the United Kingdom. Several individual underwriters live in California. The insured have their principal places of business in California.

An inconclusive factor is the place of performance of the contract, that is, payment of premiums on the one hand, and potential payment on a claim, on the other. Once again, the United Kingdom and the United States have about equal interests. API paid premiums pursuant to the usual pattern, sending its check to its broker Emett & Chandler, which forwarded payment to Hogg Robinson, which in turn forwarded it to the London underwriters. Since Lloyd's transacts business in United States dollars, any accounting credit resulting from this process would be credited to Lloyd's dollar account held at the London branch of First National City Bank. In the event of payment on a claim, payment would issue from Lloyd's dollar account. The international financial transfers constituting performance of the contract do not lend themselves readily to analysis under traditional "place of performance" concepts, because the settlement process among financial institutions gives an indeterminate solution to the concept of place of payment. Therefore, this factor is not helpful in determining which state or nation has the greater interest in performance of the contract.

Parties agree that the location of the subject matter of the insurance is not a useful consideration in resolving the choice of law problem. The proposed salvage and tow of the Gatto through various territorial waters and the high seas with stops at several ports does not weigh in favor of any compelling interest of any one state or nation. As for the present location of the Gatto, neither party argues for Malagasy law.

Under *Lauritzen* and *M/S Bremen*, this court must consider as significant the intent of the parties as to what law applies. This court has found that the parties intended the English law to apply to the definition of actual total loss, in view of the circumstances of the negotiations and the agency relationships involved. This court does not treat the intent and expectations of the parties as to this fact dispositive; it reaches the conclusion in any event that English law applies. The parties moreover could

have manifest their intent more clearly in the contract, and thereby largely avoided the dispute over choice of law. However, since the question of scope of coverage was a major focus of negotiations between Graves and Hardman, the parties' intent should be given weight. This is another factor in support of this court's choice of English law.

### Meaning

Having concluded that English law applies to the definition of actual total loss, this court must determine the meaning of this term. The major sources on the subject are the English case law[5] and the British Marine Insurance Act of 1906. The 1906 Act defines actual total loss as follows:

> "57(1) Where the subject-matter insured is destroyed, or so damaged as to cease to be a thing of the kind insured, or where the assured is irretrievably deprived thereof, there is an actual total loss."

The underwriters emphasize the difference between actual total loss and constructive total loss. Constructive total loss under English law means, *inter alia*, that the thing insured is so damaged that the cost of preserving it from actual total loss would require an expenditure exceeding the thing's value after the expenditure. 1906 Act § 60. The underwriters argue that the considerations of commercial practicality inherent in the concept of constructive total loss have no place in the concept of actual total loss. The latter term, according to the underwriters, entails catastrophic physical destruction or loss, without regard to considerations of value or cost of repair. The underwriters state that the second test given in the 1906 Act, whether the thing is "so damaged as to cease to be a thing of the kind insured," is only applicable to instances where, for example, a chemical change occurs causing a cargo to decompose. They argue that the test could only apply to a vessel if, for example, there were an explosion, fire, or similar catastrophe, such as has not occurred in the instant case. Therefore, the underwriters argue, this court must focus on the first and third tests of the 1906 Act, destruction and irretrievable loss, and define these as requiring that if an object is physically and technologically capable of being retrieved and repaired without regard to cost, then the object is not destroyed or irretrievably lost. Underwriters read the English cases as adding these criteria of savageability and repairability. They assert that the Gatto is obviously not irretrievably lost, in that the platform is still in a known position in the channel and is subject to inspection. Moreover, the underwriters argue that the parties agreed that the Gatto can be salvaged and repaired, although at considerable cost, and that the Gatto therefore is not an actual total loss as a matter of law.

The insured interpret English law differently. They argue that destruction means destruction of value; that the test whether an object is still "a thing of the kind insured" does apply to ships damaged in a casualty like the instant case; and that whether the subject is still "a thing of the kind insured" depends upon whether as a practical business matter the thing can still be considered what it was. They argue that the English cases mentioning salvage and repair use the concepts only as aids in determining whether there remains something of value. Salvage and repair, it is asserted, are not discussed in terms of technological possibility. The insured assert that when the subject matter of insurance has reached a point of damage severity so great that it has become a "wreck", then it is an actual total loss.

---

**5.** It is necessary to use with caution the eighteenth and nineteenth century cases. First, they predate the passage of the 1906 Act, which is the most important element in the present English law on the subject. Only the later of these cases talk in terms clearly comparable to the present problem. Second, the early cases show that terminology was not yet fully developed, e. g., courts might use the term "total loss" without distinguishing between constructive and actual total loss. The older cases must be read with care for their precedential value.

According to the insured, the Gatto is an actual total loss. It is as a practical business matter no longer a mobile offshore drilling platform; its value has been destroyed; it is a wreck; and the efforts required to put the Gatto back into working order cannot reasonably be considered a repair, but would be a reconstruction.

The task of this court is to determine what English law is today, not in some earlier period of more limited salvage and shipbuilding technology. The fact that technology has made such tremendous strides in recent years cuts both ways. On the one hand, if salvage and repair are dispositive to a determination whether or not the subject matter is an actual total loss, then the legal definition has shrunk to encompass an extremely narrow category of casualties. On the other hand, pushing this logic too far may actually render the concept of actual total loss virtually meaningless. Such a result would be absurd and unjust, since parties have obviously contracted for some coverage. This court has not found a recent case under modern technological capabilities involving a ship, vessel, oil platform, or comparable entity as badly damaged as the Gatto was. This court must therefore apply the law the way an English court would under these circumstances to give meaning to the concept of actual total loss.

The clear tenor of the English cases is that the court makes its determination in large measure based upon findings as trier of fact. It is inappropriate to isolate *dicta* from the cases without examining facts before that court.

Contrary to the underwriters' assertion, it is clear that any of the three parts of the definition in the British Marine Insurance Act of 1906 may be applied to a vessel like the Gatto, including the test "so damaged as to cease to be a thing of the kind insured." The underwriters provide no case law in support of their contention that the test does not apply. The cases support the insured's contention on this point. The concept was used by cases predating the adoption of the 1906 Act, and was expressed in such terms as whether the vessel were "in specie," *Kemp v. Halliday*, 122 Eng.Rep. 1361 at 1363 Q.B. (1866); whether it had "ceased to be a ship," *Barker v. Janson*, L.R. 3 C.P. 303, 305 (1868); and whether the insured object still retained her "character as a ship," *Knight v. Faith*, 117 Eng.Rep. 605 (Q.B.1850). A case directly applying the 1906 Act's definition of actual total loss strongly implied that the test "so damaged as to cease to be a thing of the kind insured" was applicable to ships as a general principle, but found no actual total loss under the test in the case before it on the facts. In *George Cohen, Sons & Co. v. Standard Marine Insurance Co.*, 21 Lloyd's List L.R. 30 (K.B.1925) an obsolete battleship not under steam was being towed by tugs when it ran aground, was abandoned by tugs, and nearly turned over. Except for this dilemma, the facts suggest no additional damage. Given the nature of the accident, it can be reasonably inferred that the ship's basic structure retained its integrity. The *Cohen* court stated, "It is not and could not be contended that she is so damaged as to cease to be a thing of the kind insured." *Id.* at 33. This court therefore may properly apply the second test of the 1906 Act and may ask, "Is the Gatto so damaged as to cease being an offshore oil drilling platform?" It may, of course, also apply the other two tests, "destruction" and "irretrievable loss." The statute and the cases make it clear that only one of the three tests must be satisfied for the court to find an actual total loss, *e. g. id.*

The concept of irretrievable deprivation has in the past required either deprivation through the physical impossibility of recovery or through a forcible seizure of the thing insured when there is no justifiable hope that the assured will recover the thing. *Id.* at 33, *Marstrand Fishing Co. Ltd. v. Beer*, 56 Lloyd's List L.R. 163, 173–174 (K.B.1936). On the facts of this case, this court finds that the Gatto is not an actual total loss under the "irretrievably deprived" test. There is no issue of forcible seizure. The Gatto's location is known and is accessible. There have been various feasible salvage plans proposed to recover the

Gatto, and it is undisputed that most parts could be recovered. The Gatto rests in water about 100 feet deep, with various parts and equipment strewn about. If any test under the Act requires the court to look to salvage as dispositive, it is the "irretrievable deprivation" test. The court does not find the instant case one justifying a liberal reading of the concept of "irreparable deprivation." [6]

This court must give specific content to the statutory tests, whether the thing insured is "destroyed" or is "so damaged as to cease to be a thing of the kind insured." There is clear authority for the insured's position that English law considers commercial reality in determining whether the thing insured is an actual total loss. In *Berger and Light Diffusers Pty., Ltd. v. Pollock*, 2 Lloyd's L.R. 442 at 454, 456 (Q.B. Commercial Court, 1973), the court found a group of corroded steel injection molds an actual total loss, when the only way to overcome the damage was by recutting the molds, which was "commercially impossible," and when the corroded molds had no more value than as scrap metal. The circumstances in *Berger* are rather different than the case at bar, and *Berger* involves cargo, not a vessel. The case is significant, however, for two reasons: it explicitly finds an actual total loss under § 57 of the British Marine Insurance Act of 1906 by taking into account the commercial realities of the situation; and the case is by far the most recent English case cited by the parties.[7] On the other hand present English law should not be read to reduce the entire question to whether as a practical business matter the thing is no longer what was insured or is destroyed. A distinction must be retained between actual total loss and constructive total loss, and complete dependence upon commercial reality or practicability creates the danger of obliterating the difference between the two concepts.

There is an intermediate position between the broad definition for which the insured argue, that a thing is an actual total loss when as a practical business matter it is not worthwhile recovering and rebuilding the thing insured, and the underwriter's position that a thing is a total loss only when it is not within the scope of present technology[8] to recover and repair it. The case law clearly recognizes an intermediate position: those situations giving rise to an actual total loss while there still exist significant, accessible physical remains. Cases refer to a ship being an actual total loss because it is a "wreck," *e. g. Sailing Ship Blairmore Co. v. Macredie*, (1898) A.C. 593 at 603 (House of Lords); *Levy & Co. v. The Merchants Marine Insurance Co.*, 5 Asp.M.L. 407 at 409 (Q.B.1885); *Knight v. Faith*, 117 Eng.Rep. 605 at 609 (Q.B.1850). *Blairmore* is as authority goes fairly recent, and it is a decision by the highest court in Great Britain. Moreover, the language of the 1906 Act, "a thing so damaged, etc.", clearly contemplates that physical remains of the thing insured may exist yet that thing be an actual total loss. The insured are correct that some physical remains may exist yet the thing insured be an actual total loss. The underwriters are correct when they assert that the damage sustained must be very great, as can be seen by *St. Margaret's Trust v. Navigator's & General Insurance Co., Ltd.*, 82 Lloyd's List L.R. 752 (K.B.

---

**6.** A different result may be required in instances where extraordinary and experimental deep-sea recovery vehicles must be utilized.

**7.** *Boon & Cheah Steel Pipes v. Asia Insurance Co.*, (1975) 1 Lloyd's L.R. 452 (Malaysia High Court 1972), is not an English case, but is a Malaysian case applying that court's view of English law. *Boon & Cheah* is, moreover, clearly distinguishable on its facts. The insurance there was a particular kind designed to cover cargo and was covered by "institute Cargo Clauses" in addition to the 1906 Act. The court stated that a prime feature of the insurance involved was that the insured got the benefit of a low premium while the underwriters got the freedom from claims for a partial loss. The court took this as a starting point in determining that there was no actual loss when 12 damaged pipes survived out of shipments totalling 668 industrial steel pipes. The case is distinguishable as involving special cargo insurance and a low premium.

**8.** After all, it is technologically possible today to turn lead into gold in a nuclear reactor; this is unreasonable, and it is not done.

1949); *George Cohen, Sons & Co. v. Standard Marine Insurance Co.*, 21 Lloyd's List L.R. 30 (K.B.1925). In *St. Margaret's Trust*, the court held the insured not entitled to a recovery on an actual total loss basis for damage to a ketch. The ketch was being worked on in port, when it was inadvertently flooded. The case is the underwriter's strongest. However, the degree of damage to the ketch occurring during the term of the insurance coverage appears considerably less than that to the Gatto. For example, after the casualty the ketch owner described in a letter that the boat had sustained little actual damage, other than needing a thorough engine and sails overhaul, although effort was required to refloat the ship, 21 Lloyd's List L.R. at 761. The *Cohen* case has already been discussed above. The vessel in *Cohen* was much less damaged than was the Gatto.

Where the underwriters' argument goes seriously astray is by applying as a dispositive test of "destruction" whether the thing insured can be salvaged and repaired at any cost, as well as by not applying the second part of the 1906 Act definition to evaluate a casualty such as occurred in the instant case. Underwriters cite *Cates Tug & Wharfage Co. v. Franklin Insurance Co.*, (1927) A.C. 698 (P.C.) for the proposition that there is no actual total loss when there is a physical possibility of raising a sunken ship, and that this possibility diminishes with the advance of salvage technology. The insured are correct that this is an improper reading of the case. A proper reading shows: A ship, the *Radius*, sank in a collision just outside a harbor entrance, and went down in about 90 feet of water. The ship was insured against total loss, and the insured made a claim, arguing that if a ship is sent to the bottom of the sea, it is a total loss. The court rejected this particular contention. The facts of the case are significant. The ship had one hole amidships, but was otherwise undamaged. It was actually raised by salvagers, at a cost of $6500 (Canadian). The ship was then temporarily patched. An intermediate appeals court weighed cost figures on the total loss issue, since the trial judge had not decided the case on that basis but rather had decided for the insured on the basis that the underwriters had accepted abandonment. The intermediate appeals court found that costs to recover and repair were less than the insured value of $24,000, and therefore there was not even a constructive total loss. The Privy Council declined to disturb this finding. The *Cates Tug* case is clearly distinguishable from the instant case on the facts, the extent of damage to the thing insured and the difficulty of recovery and repair. The underwriters cite *dicta* taken quite out of context. Likewise, *St. Margaret's Trust* and *Cohen* involved vessels much less damaged than the Gatto.

The insured's position with regard to repairability is sounder as a matter of law. Repairability is not dispositive of whether a vessel is an actual total loss. The insured assert that if a vessel must be refurbished to a very great extent in order to make it functional that the work may no longer be considered "repair," but "reconstruction" or "rebuilding." The insured's contention is supported by *Sailing Ship Blairmore* at 603 and by *Levy* at 409. The "wreck" cases, e. g., *Knight v. Faith*, also support the insured's contention: if there exists a "wreck," then there are physical remains which can be the subject of salvage and repair, yet the thing insured is still an actual total loss. The underwriters' cases show that repairability is one guide to determining whether an object is a loss, but insured's cases show that the factor is not dispositive. They also show that not all work on an object is properly characterized as "repair." It may be reconstruction or rebuilding. The tests of salvageability and repairability under modern conditions of technology are particularly inappropriate. This court concludes that under English law the subject matter of insurance may cease to be a thing of the kind insured, or be destroyed, and hence be an actual total loss, even though there are accessible physical remains of the vessel or like entity. This court also concludes that the question whether those remains may be utilized in the reconstructing of a thing of the same kind as that insured

is not dispositive of the determination whether the thing is an actual total loss. It is a matter of degree.

The difficulty resides in formulating a standard to give meaning to the concept, "so damaged as to cease to be a thing of the kind insured," as well as the concept "destroyed."

English case law on the concept of "destruction," the first test of actual total loss under the 1906 Act, is quite thin, and discussion very sparse. Once again, the underwriters argue that the test is based upon the physical possibility of salvage and repair, while the insured argue that the concept is governed by a practical business approach. This court concludes that it is proper generally to apply the same standards to the test, "where the subject-matter is destroyed" and to the test ("where the subject matter is) so damaged as to cease to be a thing of the kind insured," reserving the right under the facts to come to different conclusions on the two tests.

This court concludes that both concepts have meaning under several standards under which the trier of fact may examine the evidence. The first is the standard of reasonable salvage and/or engineering effort. The reasonable salvager must consider salvaging effort required to recover the thing insured. The reasonable engineer must consider the engineering effort required to bring the thing insured back to a functional status. If the effort required to either recover or refurbish the thing insured is too disproportionate an effort for the resulting operational entity, then the thing insured is an actual total loss.

A second standard is whether the refurbishing effort is so extensive as not reasonably to be characterized as repair. If not so extensive, then the thing insured is not an actual total loss. If the refurbishing effort is so extensive as not reasonably to be characterized as repair, but rather must be considered rebuilding, then the thing insured is an actual total loss.

A third standard is whether the cost of recovering and refurbishing the thing insured is so out of proportion to the value of the resulting operational entity that the thing must reasonably be considered an actual total loss.

 Under all three above standards, this court's findings of fact compel the conclusion that, under English law, the Gatto was an actual total loss within the term of the insurance at issue; in that the Gatto ceased to be an offshore oil exploratory platform and was destroyed.

*DAMAGES*

API argues it is entitled to recover: 1) direct costs of the Gatto project, including purchase of the Gatto, cost of legal services in connection with the purchase of the rig and attempted salvage; 2) indirect costs, including overhead charges and fair market value of employee services; 3) indemnification for contingent liabilities in the form of lawsuits and threatened lawsuits for services rendered by third parties in connection with the Gatto salvage project; 4) interest expense of 10% on borrowed funds for the project, or at least the legal rate; API cites *Rosa v. Insurance Co. of Pennsylvania*, 421 F.2d 390, 393 (9th Cir. 1970); and 5) attorneys' fees, on the basis of underwriters' alleged recalcitrance and unreasonable failure to settle and failure to act in good faith; all totalling over $2,250,000.

Burns seeks recovery for all expenses which its accounting procedures attribute to the Gatto venture, totalling some $2,275,-000. This includes some $475,000 in consequential damages caused by the insurers alleged failure to act reasonably and in good faith. Burns claims that it is entitled to a recovery for overhead. A large part of Burns's asserted damages is for expenses incurred after the end of March 1976. In addition to recovery under the basic indemnification provision of the contract, Burns argues that the "sue and labor" clause entitles the assured to recover their expenses in attempting to preserve the Gatto.[9]

---

**9.** This clause provides:

"And in the case of any loss or misfortune it shall be lawful to the assured, their factors, servants and assigns, to sue, labour, and travel for, in and about the defense, safeguard, and recovery of the said goods and merchandises,

Burns also asserts, in tort, that it is entitled to compensatory damages for expenses incurred as a result of underwriters' failure to act in good faith in its refusal to compensate for loss of the Gatto. Burns cites *Neal v. Farmers Insurance Exchange*, 21 Cal.3d 910, 920, 148 Cal.Rptr. 389, 582 P.2d 980 (1978) for requiring as the test whether the insurer acted as a reasonable or prudent insurer. Burns argues that no reasonable or prudent insurer would have refused to pay the insureds' claim under the policy nor would have refused meaningfully to discuss settlement.

The underwriters assert that the assureds' claims under the basic contractual indemnity provision are too broad; [10] that a reasonable construction of the provision must exclude certain claimed expenses, and in particular that any expenses incurred after the occurrence of an actual total loss cannot be recovered. The underwriters' argument is that if the Gatto is an actual total loss, then any expenses that are incurred thereafter cannot be expenses for salvage, recovery, towage. Against recovery of overhead expenses, the underwriters argue that there is no evidence that those expenses were any greater because of the Gatto project than they otherwise would have been. Because these expenses would have been incurred regardless, it is argued that they should not be paid for by the insurer. In summary, the underwriters argue that the evidence demonstrates some items clearly recoverable, others clearly not, and still others not supported by adequate proof that the items were actually used as claimed.

The underwriters flatly reject any recovery under the standard sue and labor clause included in the policy. They note that such a clause has a clearly understood meaning, that expenditures for "the defense, safeguard, and recovery" of the insured item are made to reduce or eliminate a covered loss under the policy, and that this provision supports an assureds' duty to the underwriters to attempt to prevent a loss. The underwriters argue that if expenditures are made after the alleged loss has occurred, then those expenditures cannot possibly have been incurred in an effort to prevent that loss. They assert that one cannot prevent what has already happened, and therefore there can be no sue and labor charges after a loss is sustained.

The underwriters argue that they have acted in good faith, and that recovery of attorneys' fees is improper. They assert their position with regard to the Gatto has been the same from the start, that the platform is not a total loss if it can be salvaged and repaired, and that this position is a reasonable one under the law and on the facts. The underwriters have proceeded on this basis in their handling of the claim and other requests by the insured. Therefore, it is asserted, there is no basis to support bad faith on their part.

The insured are correct that direct costs incurred in connection with the proposed salvage, recovery, and towage are recoverable. Likewise, an award of interest cost on capital ventured seems proper. The underwriters are also liable to indemnify the assured for claims on services rendered in connection with the Gatto project. Of course, in these cases only those items which are attributable to a viable Gatto project are properly recoverable under these categories. Once the insureds have given up hope of salvage, recovery, and towage of the Gatto, then further expenditures would not appear in the contemplation of the insurance coverage. Thus, litigation-related expenses, if recoverable at all, must be awarded under a different the-

and ship, &c., or any part thereof, without prejudice to this insurance; to the charges whereof we, the assurers, will contribute each one according to the rate and quantity of his sum herein assured."

10. The key phrase reads:

"This insurance only to indemnify the insured up to US $4,500,000 against costs and expenses incurred in connection with the purchase, salvage, recovery, towage etc. including insurance premiums but less the value of equipment salvaged."

ory. The claims for indirect costs, including overhead, less clearly falls under the coverage provision, but the insured may be able to demonstrate through citation to authority the propriety of recovery of these items. The underwriters are incorrect that no expenses are recoverable either under the basic indemnification provision or under the sue and labor clause after an actual total loss has occurred simply because of that fact. Although as a matter of fact it may ultimately be decided or adjudicated that an entity is an actual total loss, it may not be clear at the moment of casualty that such an extreme loss has occurred. Expenditures made by the insured with an eye to ascertaining the extent of damage in order to assist in determining whether the entity were an actual total loss are properly recoverable under the basic contractual indemnity and under "sue and labor." Such expenses are within the meaning and purpose of these contractual provisions.

The issue of alleged bad faith on the part of the underwriters, and assureds' recovery of litigation expenses, is problematic. It is true that the specific position taken by the underwriters, that questions of salvage and repair are determinative of whether actual total loss has occurred, may be argued in good faith on the case law. On the other hand, the underwriters' singlemindedness in this regard in the claims process including their unwillingness to consider presentations offered to demonstrate the Gatto's plight, is not how an assured would expect its claim to be handled. Rather than making any findings of fact with regard to the underwriters good or bad faith at this time, this court considers it proper to await further developments.

Parties are requested to confer and if possible stipulate to those items of damage recovery properly recoverable by the assured. It is expected that the underwriters will take into account that the assured have had to expend considerable sums in order to establish their right to a recovery under this insurance, as well as the fact that the strict rules of proof required in litigation may be inappropriate in insurance settlements. Parties are ordered to submit to this court within 30 days a stipulation indicating the areas of agreement and disagreement, as well as parties' contentions as to any points of disagreement.

Any finding of fact deemed a conclusion of law is hereby incorporated by reference.

This memorandum constitutes the findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.P.

SO ORDERED.