### The TRAVELERS INDEMNITY COMPANY, Plaintiff,

v.

### Steven BOOKER, et al., Defendants.

### Civ. A. No. 84–0981.

United States District Court, District of Columbia.

March 27, 1987.

Lawrence E. Carr, Jr., Margaret H. Warner, Washington, D.C., for plaintiff.

Gerald Freed, Washington, D.C., for defendants.

## OPINION

JOYCE HENS GREEN, District Judge.

In this action, plaintiff Travelers Indemnity Company (Travelers) seeks to recover from defendants, a syndicate of insurance underwriters doing business in the Lloyd's of London marketplace, an equitable share of the expenses it incurred in defending and settling claims brought against the law firm of Hogan & Hartson. This case was tried before the court over a two-day period in November, 1986. For the reasons set forth below, the court will enter judgment in favor of defendants.

### I

A proper understanding of the legal issues raised in this case requires some familiarity with the legal malpractice claims brought against Hogan & Hartson (H & H) in 1977 by the Securities and Exchange Commission (SEC or the Commission), as well as a primer on the workings of the Lloyd's of London insurance market. In the late 1960's and early 1970's, H & H served simultaneously as personal counsel to international financier Robert L. Vesco and as corporate counsel to Vesco's company, International Controls Corporation (ICC). During the time of this dual representation, Vesco allegedly engaged in a series of international corporate, securities and business frauds, much to the detriment of, among others, ICC. Following an SEC investigation, Vesco fled the United States and ICC went into a receivership under which it was operated essentially by SEC-appointed officials. One of those officials, an SEC attorney named David Butowsky, undertook an investigation of the company's various securities and corporate transactions, as a result of which H & H was

advised in 1973 that it might be sued, at the SEC's behest, by ICC for legal malpractice. Over the next four years, Butowsky and the law firm engaged in extensive negotiations in order to resolve the matter out of court, but these proved unsuccessful and in 1977 Butowsky filed three malpractice suits on behalf of the Commission and ICC alleging that H & H had breached its fiduciary duties to ICC while serving as its corporate counsel. Plaintiff undertook the defense of these cases and expended approximately $3.3 million in litigation costs and another $730,000 in its June 1981 settlement of the actions. It recouped approximately $1.2 million of these expenses from an insurance policy covering ICC's directors and officers and, in February 1982, requested that defendants contribute another $1.4 million. Defendants' refusal to do so precipitated this lawsuit.

During the late 1960's and early 1970's H & H purchased legal malpractice insurance from Travelers covering any acts, errors or omissions committed, or alleged to have been committed, by the firm in the United States, Canada, or any U.S. territories. This domestic primary coverage insured H & H up to $1 million for each malpractice claim brought against it, with a $3 million aggregate liability limit. The policy required the firm, upon learning of any act or omission which might give rise to a claim, to give "written notice ... to the company [Travelers] *or any of its authorized agents* as soon as practicable...." Travelers Policy Number LLB 2070462, Plaintiff's Exhibit 1 (emphasis added). In addition to this coverage, H & H purchased several policies from Lloyd's of London underwriters. The first of these was an excess domestic policy issued by underwriters different from the defendants to this action; this policy covered acts or omissions occurring in the same geographical area as the Travelers domestic policy, and provided protection in the event H & H's liability on a given claim exceeded the liability limits of the primary domestic policy. H & H also obtained an overseas primary policy from the defendants in this case, a group of Lloyd's underwriters known as the R.E. Thomson syndicate, as well as an overseas

excess policy from still a third group of Lloyd's underwriters. These policies provided coverage for legal negligence occurring in western Europe, *see Travelers Indemnity Co. v. Steven Booker, et al.,* No. 84–0981 (D.D.C. May 16, 1986) (the "May 16, 1986 Opinion") at 4 [Available on WESTLAW, DCT database], and it is upon the overseas primary policy that plaintiff bases its entitlement to contribution in this case.

At this juncture a short digression into the mechanics of the Lloyd's of London insurance market is appropriate. Contrary to the popular conception, Lloyd's is not a monolithic institution, nor does it operate in the same manner as a corporation in this country. The corporation known as Lloyd's of London provides a physical site for the sales of insurance by underwriters that are members of the corporation, as well as support and incidental services to those members. The corporation itself, however, is not at risk on any of the insurance sold by underwriting members. The purchase and sale of insurance takes place on the floor of the underwriting room at Lloyd's, or in the offices of individual insurance companies in London. Members subscribe to cover all or part of a proposed risk placement at their own election, frequently under the auspices of a syndicate— an entity comprised of a group of underwriters ranging in number from two or three to several hundred. The first syndicate to sign a slip of insurance becomes the lead underwriter on the policy. On the overseas primary policy at issue in this lawsuit, the R.E. Thomson syndicate was the lead underwriter.

■ Persons wishing to purchase insurance from Lloyd's may not do so directly, but must instead act through a broker who has been approved by Lloyd's to place risks with Lloyd's syndicates. Usually an applicant must first contact an outside broker, who will then contact a "Lloyd's broker" to place the insurance through Lloyd's. It is the recognized custom and usage of the London insurance market that the broker is the agent of the insured for most purposes, including the initial placement of the risk.

*Edinburgh Assurance Co. v. R.L. Burns Corp.*, 479 F.Supp. 138, 144 (C.D.Cal.1979), *aff'd except as to pre-judgment interest,* 669 F.2d 1259 (9th Cir.1982). Brokers approach individual underwriters, or underwriting agencies which manage individual syndicates, and submit for consideration a broker's slip which sets out the details of the risk to be placed. The broker negotiates both the insurance terms and the premium rates and, as noted above, the first underwriter to reach an agreement on these terms and to subscribe to the slip becomes the lead underwriter. The underwriter initials the slip and indicates the percentage of the risk to which he is subscribing; the broker then approaches successive underwriters until all of the risk has been placed. Once the Lloyd's broker has succeeded in obtaining subscriptions for 100 percent of the risk, he forwards the completed insurance policy and slip to the Lloyd's Policy Signing Office for approval.

In the event that the insured seeks to recover under the policy, it is the broker's responsibility "to present his client's claim, and present it in the best way possible, to the underwriters." *Id.* at 146. Claims are submitted, at the direction of the insured, to either the lead underwriter or the Lloyd's Underwriters' Claims Office, a central facility maintained by Lloyd's as a service to members. In either event, the lead underwriter typically handles the claim and the other subscribers follow the decision of the lead underwriter absent a major disagreement. If the underwriters of the policy do not agree to pay on the claim, they present their objections or questions to the broker, who forwards them to the insured for response. If the underwriters agree to accept the claim, they may either pay the broker, who in turn transmits a check to the insured, or Lloyd's may pay the insured directly.

## II

At all times relevant to this suit, H & H obtained its insurance coverage from Grayson & Dickinson (G & D), a Washington, D.C. insurance agent. In the early 1970's, H & H dispatched several of its attorneys to Geneva, Switzerland, in order to perform certain work for ICC, and G & D sought overseas malpractice coverage for this work. In 1971, G & D contacted Stewart, Smith Management Corporation (Stewart Smith), an insurance brokerage firm located principally in New York and New Jersey, in order to purchase insurance from Lloyd's. Stewart Smith forwarded H & H's application to Stewart Wrightson, Ltd., a Lloyd's broker with its principal place of business in London. Stewart Wrightson placed H & H's risk through Sedgwick Forbes, the Lloyd's underwriting agency which manages the R.E. Thomson syndicate. As a result, the R.E. Thomson syndicate became the lead underwriter on H & H's policy; Steven Booker, a named defendant in this case, was at all relevant times the Sedgwick Forbes employee who would have had responsibility for processing any H & H claims presented by Stewart Wrightson.

Beginning on September 23, 1971, defendants issued six consecutive Form U (Overseas) Lloyd's Professional Indemnity Policies (Solicitors), the last of which lapsed on September 23, 1977. Each of these primary overseas policies included the following conditions concerning notice of claims:

2. The Assured shall as a condition precedent to their right to be indemnified under this Policy *give to the Underwriters immediate notice in writing*

(a) of any claim made against them,

(b) of the receipt of notice from any person of an intention to make a claim against them.

3. *The Assured shall give to the Underwriters immediate notice in writing* of any circumstance, of which they shall become aware during the subsistence hereof, which is likely to give rise to a claim against them. Such notice having been given, any claim to which that circumstance has given rise, which may be made after the expiration of the period specified in the Schedule shall be deemed for the purposes of this Policy to have been made during the subsistence hereof.

(Emphasis added.) By their terms, the policies covered "any negligent act, error or omission, whenever or wherever committed or alleged to have been committed." Cover notes accompanying each policy, which both sides agree modified the terms of the policies, limited the duration of each to one year, and limited the insurance coverage to acts, errors or omissions committed or alleged to have been committed in western Europe. *See* May 16, 1986 Opinion at 3.

H & H first notified G & D of the possibility that claims might be brought against it in 1973. In a letter of April 9, 1973, H & H's Administrative Director Kenneth Emery advised G & D that the SEC had instituted suit against Robert Vesco and ICC, both of whom the firm had represented, and that the Commission sought to examine the firm's ICC files. The letter stated that while no suit or claim had arisen against H & H, G & D should give appropriate notice to the firm's respective insurers. The letter listed four policies: the Travelers primary domestic policy (number LLB 4604693), an American Home policy (number CE 3334492), an Employer's Reinsurance policy (number M–2036), and the Lloyd's excess domestic policy (number 71/15139/PBB 21431 W). Plaintiff's Exhibit 27. The letter made no reference to either the Lloyd's primary overseas or excess overseas policies. G & D forwarded the letter to Stewart Smith's claims department on April 12, 1973, with a cover note referring to the four policies listed above.[1] Plaintiff's Exhibit 28. Stewart Smith, which had apparently placed H & H's domestic excess policy with Lloyd's, acknowledged receipt of this correspondence on April 18, stating that it had forwarded it to the relevant insurers. The Lloyd's excess domestic policy, unlike the primary overseas policy at issue in this suit, specifically provided that notice of all claims was to be made to Stewart Smith. *See* Plaintiff's Exhibit 66.

Over the course of the next eight years, until the conclusion of the litigation against

H & H, the firm corresponded with Stewart Smith, usually through G & D, and advised it of the status of the SEC investigation and litigation. While plaintiff cites various letters and memoranda mailed to Stewart Smith as evidence that H & H gave adequate notice to defendants of claims arising under the primary overseas policies, none of this correspondence makes any reference to the overseas policies. Of the eight letters and memoranda plaintiff submitted to this court, all but one refer exclusively to the primary and excess *domestic* policies listed above; the eighth letter does not refer to any specific policy at all. One of these letters, a May 19, 1975 summary of possible claims against H & H, mentions that an international group of creditors was considering suing ICC and H & H over transactions involving a company named IOS, Ltd., and states that some people thought H & H had represented "foreign entities." *See* Plaintiff's Exhibit 45. The letter does not explain the nature of the IOS transactions, does not admit or deny that H & H represented any foreign companies, and most important, does not indicate that this representation took place anywhere outside the United States, let alone western Europe. Similarly, a November 26, 1975 letter forwarded to Stewart Smith states that one of ICC's principal claims concerned a transaction involving a company known as Empire Financial. *See* Plaintiff's Exhibit 53. This transaction, however, took place in 1968 and 1969, well before H & H acquired its overseas policies, *see* Plaintiff's Exhibit 45 at 4, and there is nothing in either the November 26 or May 19 letters indicating the international character of the transaction or where H & H performed the legal work pertaining to it. On December 9, 1975, H & H forwarded a copy of a letter from David Butowsky outlining ten possible claims against H & H. *See* Plaintiff's Exhibit 54. Again, the international character of these claims is neither apparent on the face of

---

**1.** The cover note referred to the Lloyd's policy as "No. L 71–08–06–20." This number is a cross-reference to the Lloyd's excess domestic policy, not to either the primary or excess overseas policies. *See* Defendants' Exhibit I.

the correspondence, nor does H & H make any effort to highlight it in its letter.[2]

Plaintiff also points to the yearly renewal forms that H & H submitted to Stewart Smith in order to continue the overseas coverage. In each of these forms, H & H was asked whether any claims had been filed against it or were likely to be brought. In its July 24, 1973 renewal form, H & H wrote: "potential claims on record with your underwriters, May and June, 1973 (Arnold G. Pessin and International Controls Corp)." Plaintiff's Exhibit 34. On its 1975 and 1976 forms, H & H answers this question by referring to the correspondence discussed above. *See* Plaintiff's Exhibits 46 and 55. None of these responses suggest that the ICC claims involved international representation by the firm, nor do they indicate that the claims implicate the overseas policies;[3] indeed, each of the letters referred to in the last two renewal forms expressly cite the domestic policies and make no mention of the overseas coverage.

After the SEC initiated suit, H & H wrote to G & D and Stewart Smith advising them of the suits and enclosing copies of the complaints as well as a 160-page Preliminary Response the firm had prepared following release of Mr. Butowsky's 800-page investigative findings. In its letter of December 5, 1977, H & H for the first and only time did not recite its domestic policy numbers as it had in all previous correspondence; rather, the letter made no reference to any specific policy. The enclosed complaints, like much of the 1973-75 correspondence, refer to transactions involving several foreign corporations, but again do not indicate where H & H's representation took place or whether any of the alleged legal malpractice occurred in western Europe. The first and only references to the firm's work in Europe appear in two sentences in the Preliminary Response. The response states on page 16 that H & H lawyers attempted to research a question of Swiss secrecy law in the United States and, when these efforts proved unsuccessful, "[t]hey then traveled to Europe and discussed [the issue] with two Swiss law firms...." *See* Plaintiff's Exhibit 62 at 16. The only other mention of H & H's foreign representation appears on page 21: "the only involvement H & H had with the stock sale by Cornfield was that Jeffers [an H & H partner], in Geneva on other matters, was *peripherally involved, at most as an observer,* in various preliminary discussions and negotiations in Geneva concerning the sale...." *Id.* at 21 (emphasis supplied). These two passing references, buried in a lengthy report and accompanied by a cover letter that in no way highlighted them, were the only direct statements even suggesting that the claims against H & H might have arisen from acts or omissions occurring in western Europe. The Preliminary Response was mailed, along with the other correspondence, to Stewart Smith.

On January 29, 1982, Michael Dunn, a Travelers claims manager, wrote to the law firm of Mendes & Mount seeking contribution from Lloyd's under the overseas policy. Mendes & Mount had represented a different group of Lloyd's underwriters who had issued certain insurance coverage for ICC's directors and officers; although the firm did not represent the R.E. Thomson group, it forwarded Mr. Dunn's letter to those underwriters in London. Mr. Dunn himself testified at trial that he first learned of ICC's claims against H & H in April 1973 in his capacity as a claims supervisor in plaintiff's Washington, D.C. office, and that he began personally handling the claim in 1974. Despite his extensive in-

---

**2.** In the May 16, 1986 Order, the court mentioned in a summary of the facts of this case that "[s]everal of these letters [from H & H to Stewart Smith] referred to certain international and European transactions in which H & H represented ICC." May 16, 1986 Order at 3. This characterization of the letters, offered by way of short-hand, in no way represented a finding as to the adequacy of H & H's notice, as the court made clear elsewhere. *See id.* at 8-9 ("The adequacy of these letters as notice to defendants ... is open to dispute").

**3.** The renewal form questions concerning pending or possible claims were not limited solely to claims under the overseas policy, but rather sought information concerning *any* claim brought during the previous five years or *any* circumstance which might result in future claims. *See, e.g.,* Plaintiff's Exhibit 34.

volvement with the case, it was not until June 1980 that he first became concerned with H & H's "possible overseas involvement" and first realized that some of the acts giving rise to ICC's claims may have occurred outside the territorial limits of the Traveler's policy. Trial Transcript at 68. These concerns prompted Travelers to inquire of H & H whether the firm had any overseas coverage, and in September 1980, Dunn received a copy of the overseas policy. Travelers, however, took no reservation of rights disclaiming liability for acts or missions occurring outside the United States and Canada, either upon receipt of the overseas policy or at any time prior to settling the SEC litigation; indeed, plaintiff did not even attempt to notify defendants of the litigation until seven months after it had settled the ICC claims and a full seventeen months after it learned of the overseas coverage.

### III

It is undisputed that none of the various letters discussed above were sent to defendants in London and that the correspondence referred to in H & H's renewal forms was not "on file" with defendants as H & H suggested. Indeed, no notice of the three lawsuits was given to the R.E. Thomson group, as required by the overseas policy, until February, 1982. Travelers nevertheless claims defendants are liable for contribution of defense and settlement costs on the theory that (1) H & H gave adequate notice of its claims to Stewart Smith, and (2) notice to Stewart Smith constituted notice to defendants as the former served as agent of the latter. As the court cannot accept either of these propositions, judgment must be entered in favor of defendants.

 There is, of course, no absolute rule governing whether an insurance broker is an agent of the insurer or insured. Normally, however, brokers are the agents of the person who first employs them, and if, as here, they are employed to procure insurance, they are the agents of the insured. In addition, it is undisputed that under the settled practice and custom of the Lloyd's insurance market, insurance brokers such as Stewart Wrightson act as agents of the insured. *Edinburgh Assurance*, 479 F.Supp. at 151. Plaintiff asks this court to depart from the general rule and upset the settled expectations of an international insurance market because defendants "artfully concealed their identities from H & H" by providing only Stewart Smith's address on the confirmations of insurance, cover notes, and policies themselves, and because defendants clothed Stewart Smith with apparent authority to act as their agent by empowering it to cancel the policies and to accept premiums and renewal forms. None of these factors, however, converted Stewart Smith into the agent of the R.E. Thomson syndicate.

To begin with, plaintiff does not suggest that H & H's arrangements with their Lloyd's underwriters differ in any material respect from the normal practice in the Lloyd's market. That practice has led at least two courts to conclude that approved Lloyd's brokers are the agents of the insured. *See id.; Howard Fuel v. Lloyd's Underwriters*, 588 F.Supp. 1103, 1106 n. 7, 1108 (S.D.N.Y.1984) (insurance broker not acting as representative or de facto agent of underwriters); *see also Thebes Shipping, Inc. v. Assicurozioni Ausonia SPA*, 599 F.Supp. 405, 409 (S.D.N.Y.1984) (Lloyd's broker "usually acts to help with the preparation of the claim and its processing"). Plaintiff has pointed to no special circumstances warranting a different result here. The fact that Stewart Smith issued a confirmation of insurance notifying H & H that it had successfully placed its risks with underwriters in the Lloyd's market is consistent both with an agency relationship between the broker and the insured, and the customary practice of Lloyd's brokers. The confirmation itself states that "acting upon *your* [H & H's] instructions and *for your account* we [Stewart Smith] have procured insurance from certain Insurer(s)." Plaintiff's Exhibit 6 (emphasis added); *see also* Plaintiff's Exhibit 8, Broker's Copy ("We confirm that acting upon your instructions we have effected insurance for your account with underwriters at Lloyd's of London"). It fur-

ther provides that "[t]his confirmation shall be automatically terminated and voided by delivery of the Cover Note, Certificate of Insurance or Policy to the Assured or its representative" and that it is governed and subject to all the terms of the cover note, certificate of insurance or policy. Plaintiff's Exhibit 6. Neither the confirmation nor the cover note indicate that brokers may bind underwriters by their actions. On the contrary:

> In order for an insured to have some evidence of the insurance placed during the period after the slip is completed but before the policy is issued, brokers may furnish the insured with a cover note memorializing the fact of insurance. Brokers consider the cover note a contract between them *and the insured* indicating that they have placed the insurance.

*Edinburgh Assurance,* 479 F.Supp. at 146 (emphasis added).

■■■■ Similarly the fact that these two documents state that the underwriters and the insured can cancel the policy by giving notice of cancellation to Stewart Smith hardly renders that broker an agent of the underwriters. As the confirmation and cover note state, Stewart Smith is simply an "intermediary" in such a situation, not an authorized agent of the underwriters for all purposes. Nor is it surprising that Lloyd's would provide brokers with renewal forms or direct that premiums be paid to brokers; Lloyd's is an international market and, for the convenience of those its underwriters insure, it permits insureds to deal with brokers to transact routine, ministerial business. The handling of such routine matters is certainly not a special circumstance sufficient to make Stewart Smith an agent of the R.E. Thomson syndicate. Finally, plaintiff makes much of the fact that while the overseas policy requires that notice be given to the underwriters, it does not identify the relevant insurers or give their addresses. The simple fact remains, however, that H & H managed, without benefit of names or addresses, to secure the policy; if it wished to notify the underwriters of any claims under that policy it could have done so in precisely the same

manner: by directing Stewart Smith to make appropriate contact with the insurers.

The reason that H & H did not direct Stewart Smith to file any claims or give appropriate notice is quite simple: H & H did not intend to give notice under the overseas policy because it did not believe the policy applied. Dorothea Bell Yates, G & D's office manager until 1979, testified at a deposition that H & H, in filing its claims under the domestic policies, never mentioned its overseas policy and that G & D would not have given Stewart Smith notice of any claims under that policy unless it believed suits would be filed against H & H in European courts. Trial Transcript at 289–90. Similarly, Michael Dunn testified that when he first learned of the overseas policy in 1980, he discussed its coverage with an H & H partner who advised him that it applied only to claims made against the firm in the courts of Europe. *Id.* at 93. And Robert Jeffers, the H & H partner whose "peripheral" involvement as an observer to loan negotiations in Switzerland presumably gave rise to at least some of the overseas claims, conceded at trial that the SEC's complaint contained nothing indicating that any of the allegedly negligent acts occurred in Switzerland. *Id.* at 57.

■■■■ Plaintiff is correct in arguing that H & H's intent is irrelevant to the question of whether the firm gave adequate notice of its claims—just as an intent to notify does not compensate for the deficiencies of inadequate notice, a lack of intent would not violate otherwise valid notice. The fact that H & H did not intend to file any claims with defendants, however, explains why a sophisticated law firm and its experienced insurance agent never once mentioned the overseas policy while they diligently apprised the domestic insurers of every development of the SEC investigation and litigation. It also explains why plaintiff has been forced to argue both that Stewart Smith acted as defendants' agent, and that the occasional mention of international companies in correspondence spanning eight years constituted notice to defendants. The court's conclusion that Stewart

Smith was not an agent of the R.E. Thomson syndicate is sufficient to dispose of plaintiff's contentions and this case. Even if Stewart Smith were defendants' agent, however, a review of the correspondence and renewal forms forwarded to that broker makes clear that H & H never gave notice that the SEC's claims against it arose, even in part, from errors or omissions that occurred in western Europe. References in H & H's correspondence to international companies that conducted business with ICC in no way suggest that any alleged malpractice took place abroad; countless U.S. law firms perform legal work in this country for clients that engage in foreign trade. Similarly, the copies of the SEC complaints mailed to Stewart Smith would not suggest to even a trained reader that the challenged legal representation occurred in Europe. The court's own review of those complaints confirms what Mr. Jeffers acknowledged at trial: nothing in the documents indicates that any of the errors or omissions were committed anywhere other than the United States, where H & H maintained its only office. Indeed, plaintiff's own handling of the claims demonstrates that the possibility of foreign exposure was simply not disclosed by H & H's correspondence. Mr. Dunn first learned of the claim in 1973 and personally processed it from 1974 on, yet despite his extensive involvement with the case it did not even occur to him that the claims may have arisen abroad until 1980—seven years after H & H filed its first notice under its domestic policy. Travelers was well aware of its policy's limits and in fact took a reservation of rights as to any intentional acts, fraud or deceit, as the policy did not cover such conduct; yet the company never reserved its rights so as to disclaim liability for any foreign negligence. Trial Transcript at 200–01. The logical and obvious explanation for this failure is that Travelers did not believe, based on the documentation H & H provided, that the SEC claims involved negligence that took place abroad. Plaintiff nevertheless asks this court to rule that the very same documentation which failed to alert G & D and Travelers' own claims managers

to the possibility of H & H's foreign negligence—documentation which, not insignificantly, explicitly referred to all of H & H's domestic insurance policies yet never once mentioned its overseas coverage—served to put Stewart Smith on notice that H & H's negligence occurred in western Europe and that H & H sought to submit a claim under its overseas policy. The court simply cannot accept such a proposition. The *only* direct reference to any legal work H & H performed for ICC outside of the United States appears in two sentences in a 160-page report, which was mailed to Stewart Smith, along with three voluminous complaints, in December, 1977. The accompanying cover letter makes absolutely no mention of this foreign representation, and the two sentences themselves make clear the extremely limited nature of this work: several associates flew to Switzerland to discuss Swiss secrecy law, and one partner "observed" a loan negotiation in Geneva. These two sentences sat for years in plaintiff's claims file without sounding any warning signals to Travelers that the SEC litigation encompassed foreign malpractice; there is no reason to believe they rang any louder in Stewart Smith's files. The court concludes, therefore, that H & H did not give notice to Stewart Smith of any claim arising under the overseas policy.

Accordingly, it is this 27th day of March, 1987,

ORDERED that judgment be and it hereby is entered in favor of defendants Steven Booker, The General Insurance Company of Trieste and Venice, Excess Insurance Company, and Certain Underwriters at Lloyd's, London, and against plaintiff, The Travelers Indemnity Company.