# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 31, 2022                    Decided April 22, 2022

No. 21-7033

VANTAGE COMMODITIES FINANCIAL SERVICES I, LLC,
APPELLANT

v.

ASSURED RISK TRANSFER PCC, LLC, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01451)

*John Gibbons* argued the cause for appellant. With him on the briefs was *Steven J. Roman.*

*G. Richard Dodge, Jr.* argued the cause for Reinsurer appellees. With him on the brief were *Alanna Clair*, *Mary Ann D'Amato*, and *William Davis.*

*Christopher J. St. Jeanos* argued the cause for Willis appellees. With him on the brief was *Elizabeth J. Bower.*

Before: HENDERSON and TATEL, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, Circuit Judge: In this insurance coverage dispute, an insured company seeks to sidestep its insurer by collecting a $22 million claim from ten reinsurers and insurance brokers. The district court concluded that these entities are not liable for the insured company's losses. We agree.

**I.**

This case involves a complex network of insurance and reinsurance agreements between several companies. Appellant Vantage Commodities Financial Services I, LLC ("Vantage"), a company that finances retail energy companies, entered into a loan agreement extending credit to Glacial Energy Holdings ("Glacial"). Seeking to mitigate the risk of Glacial defaulting on its loan, Vantage retained Equifin Risk Solutions LLC ("Equifin") to create and manage Assured Risk Transfer PCC LLC ("ART"), a special purpose "captive" insurance entity backed by reinsurance. Equifin in turn retained Willis Towers Watson Management (Vermont) Ltd. ("Willis Vermont") to assist in the formation, licensing, and management of ART.

After forming ART, Equifin President Paul Palmer began looking for reinsurers. In December 2012, reinsurers Hannover Ruckversicherung AG ("Hannover Re") and Partner Reinsurance Europe plc ("Partner Re") committed to reinsure ART for a portion of insurance payments made to Vantage under the primary insurance policy, confirming their commitments in signed reinsurance placement slips. Willis Vermont, on behalf of ART, then issued a Credit Insurance Binder ("2012 Binder") which confirmed that Vantage's credit insurance had been bound with ART, noted that ART had secured reinsurance coverage, and outlined the general terms of the insurance and reinsurance agreements. Am. Compl. Ex. 5. Two weeks later, ART issued a formal Credit Insurance

Policy, insuring Vantage for up to $22 million for one year against any nonpayment or losses from lending to an energy service company, such as Glacial. Am. Compl. Ex. 1. The policy made no mention of reinsurance.

In the months following the issuance of the Credit Insurance Policy, ART entered into a formal reinsurance contract with Hannover Re and Partner Re whereby each reinsurer agreed to cover a share of ART's limit of liability in insuring Vantage. Am. Compl. Ex. 8. ART also entered into a reinsurance agreement with five additional reinsurers ("Panel Reinsurance Agreement"). Am. Compl. Ex. 7. The two reinsurance agreements (collectively, "Reinsurance Agreements") covered about 90 percent of the $22 million limit of liability in ART's Credit Insurance Policy with Vantage. Both Reinsurance Agreements stated that they were "solely between [ART] and the Reinsurer[s], and nothing contained in th[ese] Agreement[s] shall create any obligations or establish any rights against the Reinsurer[s] in favor of any person or entity not a party hereto." Am. Compl. Ex. 7 at 2, Ex. 8 at 4.

Thereafter, Vantage requested that Palmer send another copy of the 2012 Binder. In response, Palmer sent Vantage an updated version of the binder ("2013 Binder"), which included an updated list of reinsurers and stated that the "revised Binder is being issued for review/illustrative purposes only." Am. Compl. Ex. 6.

When Glacial defaulted on its loan, Vantage submitted a claim to ART seeking over $19 million in payment. Vantage and ART disputed the claim in arbitration, and the arbitration panel held that Vantage was entitled to recover over $25 million, consisting of $22 million under the Credit Insurance Policy plus interest and costs. ART had insufficient funds to pay the arbitration award itself. Before it submitted a claim

under the Reinsurance Agreements, however, the seven reinsurers (collectively, "Reinsurers") notified ART that any future claim would be denied because ART had failed to comply with the terms of the Reinsurance Agreements. In particular, ART failed to notify the Reinsurers of Vantage's claims or provide the Reinsurers with proof of Vantage's losses within the time limit provided by the Reinsurance Agreements.

After the Reinsurers notified ART that they would deny any claims for reinsurance, Vantage filed suit in the U.S. District Court for the District of Columbia against ART, Willis Vermont, and the Reinsurers. Am. Compl. ¶¶ 5–6, 9–15. Vantage also named as defendants Willis Limited and Willis Re Inc., reinsurance intermediaries that share the same parent company as Willis Vermont. *Id.* ¶¶ 7–8 & Ex. 7 at 3. Vantage raised claims against the Willis Defendants for negligence, professional negligence, negligent undertaking, and negligent misrepresentation. *Id.* ¶¶ 173–81, 186–197. As for the Reinsurers, Vantage alleged claims for breach of contract, breach of implied contract, promissory estoppel, and unjust enrichment. *Id.* ¶¶ 161–64, 198–214. Vantage also sought a declaration of "the obligations of [the Reinsurers] under the contractual agreements to pay" for Vantage's losses. *Id.* ¶¶ 165–72.

The district court dismissed Vantage's claims for breach of contract and declaratory judgment. *Vantage Commodities Financial Services I, LLC v. Assured Risk Transfer PCC, LLC*, 321 F. Supp. 3d 49, 61–63 (D.D.C. 2018) (*Vantage I*). After discovery, the court granted summary judgment for the Reinsurers and the Willis Defendants as to the remaining claims against them. *Vantage Commodities Financial Services I, LLC v. Willis Ltd.*, 531 F. Supp. 3d 153, 166–79 (D.D.C. 2021) (*Vantage II*). Vantage appealed. We review de novo the district court's rulings on the defendants' motions to dismiss

and motions for summary judgment. *Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020) (for dismissal); *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006) (for summary judgment).

**II.**

We affirm the district court's dismissal of Vantage's breach of contract and declaratory judgment claims because, as the district court concluded, Vantage failed to plead facts sufficient to show a contractual relationship with the Reinsurers. Vantage alleged that the Reinsurers "created a direct contractual relationship when Willis and ART . . . , acting on behalf of [the Reinsurers] as their agents, provided the Credit Insurance Binders to Vantage." Am. Compl. ¶ 65. But the binders' disclosures of a reinsurance policy and description of that policy did not create a direct contractual relationship between Vantage and the Reinsurers. As the district court explained, a reinsurer generally "does not have a direct contractual relationship with the original insured unless the terms of the reinsurance agreement create such a relationship." *Vantage I*, 321 F. Supp. 3d at 60 (citing *Bruckner-Mitchell v. Sun Indemnity Co. of New York*, 82 F.2d 434, 444 (D.C. Cir. 1936)). The Reinsurance Agreements here created no contractual relationship with Vantage, stating instead that the agreements were "solely between [ART] and the Reinsurer[s]" and that "nothing contained in th[e] Agreement[s] shall create any obligations or establish any rights against the Reinsurer[s] in favor of any person or entity not a party hereto." Am. Compl. Ex. 7 at 2, Ex. 8 at 4.

Vantage cites several cases explaining that, in certain circumstances, the reinsurer may become directly liable to the insured. *See, e.g.*, *World Omni Financial Corp. v. Ace Capital Re, Inc.*, No. 02-cv-0476, 2002 WL 31016669, at *1 (S.D.N.Y.

Sept. 10, 2002) (Reinsurer and original insured "dealt directly with each other," and reinsurer "consistently treated [original insured] as if it were [the reinsurer's] direct insured."); *Executive Risk Indemnity, Inc. v. Charleston Area Medical Center, Inc.*, 681 F. Supp. 2d 694, 724 (S.D. W. Va. 2009) ("[Reinsurer] dealt with [insured] directly[.]"). But unlike those cases, Vantage's complaint contains no allegations that the Reinsurers dealt directly with Vantage or otherwise treated Vantage as if it were directly insured by them. Accordingly, Vantage's breach of contract and declaratory judgment claims are not "plausible on [their] face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## III.

The district court properly granted summary judgment for the Reinsurers on Vantage's remaining claims against them. Beginning with the implied contract claim, Vantage points to no record evidence of any consideration to support its alleged implied contract with the Reinsurers. *See Paul v. Howard University*, 754 A.2d 297, 311 (D.C. 2000) (To establish an implied-in-fact contract, a plaintiff must show "all the necessary elements of an express contract—including offer, acceptance, and consideration[.]"). As the district court observed, the record reveals only two exchanges of consideration, neither of which occurred between Vantage and the Reinsurers. First, the Credit Insurance Policy required Vantage to pay premiums to ART in the amount of 12 percent of the policy limit in exchange for the insurance provided by ART to Vantage. *Vantage II*, 531 F. Supp. 3d at 175–76. Second, the Reinsurance Agreements obligated ART to pay $800,000 in premiums to the Reinsurers as consideration for their reinsurance obligations to ART. *Vantage II*, 531 F. Supp. 3d at 176. Because Vantage identifies no evidence of any "consideration that the Reinsurers received for allegedly

obligating themselves to cover Vantage directly *and on top of* the risk that [the Reinsurers] assumed on behalf of ART," *Vantage II*, 531 F. Supp. 3d at 176, the implied contract claim cannot survive summary judgment. *See, e.g., Steele v. Isikoff*, 130 F. Supp. 2d 23, 33 (D.D.C. 2000) (finding insufficient evidence to support "the alleged second contract . . . because it lacks any independent, valid consideration").

Vantage's promissory estoppel and unjust enrichment claims also suffer from the absence of any evidentiary support. As pled, both claims depend on the existence of an agency relationship between the Reinsurers and either ART or the Willis Defendants. *See* Am. Compl. ¶ 206 (alleging that the Reinsurers "effectively promised" to pay Vantage's losses by "providing Vantage with the Credit Insurance Binders through [the Reinsurers'] agents, ART . . . and Willis"); *id.* ¶ 212 (alleging that "Vantage conferred a benefit on [the Reinsurers] by paying premiums to them through their agents, ART . . . and Willis"). Vantage asserts that ART and the Willis Defendants had "actual authority" to act as the Reinsurers' agents in their "dealings with Vantage." Appellant's Br. 51; *see* Restatement (Third) of Agency § 3.01 (2006) ("Actual authority . . . is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf."). But Vantage points to no evidence of statements or conduct by the Reinsurers that authorized ART or the Willis Defendants to act on their behalf. Nor does Vantage point to any evidence that ART or the Willis Defendants interpreted any of the Reinsurers' statements or conduct as a manifestation of consent to act on their behalf. Although the Panel Reinsurance Agreement described Willis Limited and Willis Re Inc. as "intermediaries . . . through whom all communications and payments relating [to the reinsurance contract] shall be transmitted," Am. Compl. Ex. 7 at 3, the use of these entities

as intermediaries granted them no broad authority to act on behalf of the Reinsurers as their agents. As the district court explained, "'handling of such routine matters' as transmitting communications or even premium payments 'is certainly not . . . sufficient to make [a broker] an agent of the [Reinsurers].'" *Vantage II*, 531 F. Supp. 3d at 171 (quoting *Travelers Indemnity Co. v. Booker*, 657 F. Supp. 280, 287 (D.D.C. 1987)).

Changing tack from the agency theory presented in its complaint, Vantage argued on summary judgment that it need not establish agency to prevail on its promissory estoppel claim because the Reinsurers "directly assented to the promises transmitted to Vantage." Appellant's Br. 48. But the Credit Insurance Binders Vantage cites contain no promise that the Reinsurers would pay for Vantage's losses under its Credit Insurance Policy. As noted above, these binders merely disclose the existence and terms of a reinsurance agreement between ART and the Reinsurers.

Because Vantage's claims of implied contract, promissory estoppel, and unjust enrichment are wholly unsupported by record evidence, the Reinsurers are entitled to summary judgment. *See* Fed. R. Civ. P. 56(a) (Summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

## IV.

Vantage's claims against the Willis Defendants fare no better than its claims against the Reinsurers. To begin with, its claims of negligence, professional negligence, and negligent undertaking are barred by the District of Columbia's "economic loss doctrine," which prohibits claims of negligence where, as here, a claimant seeks to recover purely economic losses. *See Aguilar v. RP MRP Washington Harbour, LLC*, 98

A.3d 979, 985–86 (D.C. 2014). The economic loss doctrine carves out a "limited" special relationship exception, which applies when the defendant has "an obligation . . . to care for [the plaintiff's] economic well-being or an obligation that implicate[s the plaintiff's] economic expectancies." *Whitt v. American Property Construction, P.C.*, 157 A.3d 196, 205 (D.C. 2017) (internal quotation marks omitted). But as the district court explained, Vantage and the Willis Defendants had nothing approaching the "close" or "intimate" nexus needed to fall within the special relationship exception. *Vantage II*, 531 F. Supp. 3d at 177–79 (internal quotation marks omitted); *see Aguilar*, 98 A.3d at 985 n.3 (analogizing the District of Columbia's special relationship exception to those in other jurisdictions that require an "'intimate nexus'" or "'close nexus'" between the parties). Although Willis Limited served as an intermediary between ART and the Reinsurers, it had no contact with Vantage. Willis Re Inc., though listed as an intermediary in the Panel Reinsurance Agreement, had no involvement with any of the transactions in this dispute. *Vantage II*, 531 F. Supp. 3d at 172 n.14 ("[T]he Willis Defendants contend that Willis Re Inc. . . . was not involved in these transactions," and "Vantage never disputes this fact."). Willis Vermont assisted Equifin in its formation, licensing, and management of ART but had minimal direct contact with Vantage. Because "there was no mutually agreed upon relationship" between Vantage and the Willis Defendants, *Aguilar*, 98 A.3d at 985, the economic loss doctrine applies and bars Vantage's claims.

Next, we turn to Vantage's claim of negligent misrepresentation. Under District of Columbia law, "[o]ne who . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or

competence in obtaining or communicating the information." Restatement (Second) of Torts § 552 (1977); *Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 990 (D.C. 1980) (adopting the definition of negligent misrepresentation set forth in the Restatement (Second) of Torts).

Vantage alleges that the Willis Defendants misrepresented the terms of the Reinsurance Agreements when they stated in the Credit Insurance Binders that reinsurance was ceded on the "same terms, conditions and settlements" as the original insurance policy, a statement Vantage construed as a commitment to pay claims covered by its policy with ART. Am. Compl. ¶¶ 193–94 (internal quotation marks omitted). But this statement is identical to the language in Hannover Re's and Partner Re's reinsurance placement slips, which confirmed their reinsurance commitments at the time that the 2012 Binder was issued. And Willis Vermont obtained these placement slips to document the reinsurers' commitments prior to issuing the 2012 Binder on behalf of ART. Vantage points to no record evidence suggesting that the 2012 Binder's representations were false when made or that Willis Vermont "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information" in the 2012 Binder. Restatement (Second) of Torts § 552; *see id.* cmt. e ("[T]he defendant is subject to liability if, but only if, he has failed to exercise the care or competence of a reasonable man in obtaining or communicating the information."). As for the 2013 Binder, Vantage could not have reasonably relied on its representations because the binder stated explicitly that it was "being issued for review/illustrative purposes only." Am. Compl. Ex. 6; *see, e.g., In re U.S. Office Products Co. Securities Litigation,* 251 F.Supp.2d 58, 74 (D.D.C. 2003) ("[T]he plaintiff [must] reasonably rel[y] on the alleged misrepresentation.").

Vantage next asserts that the Willis Defendants "committed a misrepresentation [by failing] to send Vantage's demand for arbitration to the Reinsurers after Willis had informed Vantage that it would pass information to Reinsurers." Vantage Cross Motion for Partial Summary Judgment and Opposition to Defendants' Motions for Summary Judgment at 46, *Vantage Commodities Financial Services I, LLC v. Assured Risk Transfer PCC, LLC*, No. 17-cv-1451, ECF No. 144-1. In support, Vantage cites a single email from Willis Vermont stating that Vantage's insurance premium "should . . . be paid to [ART]" and that "[u]pon receipt, Willis [Vermont] as manager of ART will remit payment to ART's reinsurers . . . as is customary." Am. Compl. Ex. 10. Because this email includes no indication that the Willis Defendants represented that they would pass information to the Reinsurers, it provides no support for Vantage's negligent misrepresentation claim.

Vantage insists that the district court erred because it applied the economic loss doctrine to Vantage's claim of negligent misrepresentation. But we need not address this argument. As discussed above, and as the Willis Defendants argued before the district court, the evidentiary record creates no genuine dispute of material fact regarding Vantage's claim of negligent misrepresentation. Accordingly, we affirm the district court's grant of summary judgment for the Willis Defendants. *See EEOC v. Aramark Corp., Inc.*, 208 F.3d 266, 268 (D.C. Cir. 2000) ("[B]ecause we review the district court's judgment, not its reasoning, we may affirm on any ground properly raised.").

## V.

For the foregoing reasons, we affirm.

*So ordered.*